**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ATTACK THE SOUND LLC, an Illinois limited liability company, DAVID WOULARD, STAN BURJEK, JAMES BURJEK, BERK ERGOZ, HAMZA JILANI, MAATKARA WILSON, ARJUN SINGH, MAGNUS FIENNES, and MICHAEL MELL, each individually and on behalf of all others similarly situated, | ) ) ) ) ) ) ) ) ) ) | Case No.<br><br>**DEMAND FOR JURY TRIAL** |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| KUNLUN TECH CO., LTD, SKYWORK AI PTE.LTD, and UNKNOWN DEFENDANTS, | ) ) ) ) | |
| Defendants. | ) | |

**COMPLAINT**

Plaintiffs, Attack the Sound LLC, David Woulard, Stan Burjek, James Burjek, Berk Ergoz, Hamza Jilani, Maatkara Wilson, Arjun Singh, Magnus Fiennes, and Michael Mell, individually and on behalf of all others similarly situated, by their attorneys Loevy & Loevy, and for their complaint against Defendants Kunlun Tech Co., Ltd. ("Kunlun"), Skywork AI Pte. Ltd. ("Skywork"), and Unknown Defendants, allege as follows:

**NATURE OF THE CASE**

1. This case challenges Defendants' practice of systematically copying and storing works by independent artists to fuel a commercial, mass-market

music-generation engine branded as "Mureka." Defendants Kunlun Tech Co.
Ltd., a global conglomerate with a market capitalization over $7 billion USD as
of November 2025, and its holding subsidiary Skywork AI Pte. Ltd. (together,
"Defendants") built a rapidly expanding AI music business by disregarding the
intellectual property rights of the very artists they claim to empower.
Defendants created and sell an AI product that directly competes in the
markets where independent artists earn their living, including sync licensing,
production and library music, streaming, commissions, and lyric licensing. On
information and belief, Defendants did not merely "study" genres or abstract
musical styles; to run their mass-market music engine, they copied and
maintain a centralized library of massive quantities of sound recordings and
musical works taken from online sources without permission, together with
text and metadata, and use those copies to train and operate models that
produce outputs designed to replace licensed music at scale.

2.      Plaintiffs are independent musicians and songwriters whose
livelihoods depend on licensing and recognition of their works. They have
invested time, talent, and money to create original music, only to see
Defendants appropriate and weaponize that work against them. Without the
bargaining power of major labels, independent artists are particularly exposed
to Defendants' conduct and suffer especially severe and unfair harm from
Defendants' unlicensed uses and their marketing of AI-generated music as a
cheaper substitute for human creativity.

3.     U.S. copyright law gives creators exclusive rights to control how their works are reproduced, distributed, adapted, and publicly performed, including both sound recordings and musical compositions. These protections apply to recordings, lyrics, and non-lyrical musical expression such as melodic, harmonic, rhythmic, structural, and arrangement choices. Those rules exist so that the people who create music, not the technology companies that copy it, are fairly compensated, incentivizing continued artistic innovation and cultural development.

4.     Defendants publicly promote Mureka as a system trained on "vast databases" and "millions of tracks" in order to generate "studio-quality," "radio-ready" songs with realistic vocals and instrumentation that rival traditional productions. Defendants refuse to identify the sources or licenses for those tracks. On information and belief, Defendants copied, ingested, and stored entire copyrighted recordings and compositions, including Plaintiffs' works, during pre-training, training, and fine-tuning of their models, without authorization and without paying for the works they copied and retained.

5.     Beyond copying sound recordings, Defendants also built and deployed large-scale lyric and text models. Mureka markets "lyrics generators," "country lyrics generators," "rap and disstrack generators," and upload-based lyric tools as sources of commercial-ready content. On information and belief, Defendants assembled those capabilities by copying and tokenizing lyric content and related text at scale from online sources and corpora without securing the readily available licenses for lyric display and reproduction.

Defendants then market the resulting lyric outputs as royalty-free, commercial-use material, further displacing licensed lyric and composition markets.

6.     Liability in this case does not turn on whether a single Mureka output is a note-for-note or word-for-word replica of any one work. Defendants' liability arises from their unauthorized reproduction, ingestion, and use of specific copyrighted recordings and compositions during pre-training, training, and fine-tuning, and from their collection and retention of a centralized library of pirated or otherwise unauthorized copies beyond any technical necessity. That wholesale, non-transformative copying is unlawful and not justified by fair use.

7.     Defendants' commercial success and rapid growth are built directly on this unauthorized exploitation of copyrighted works. Since launching Mureka's consumer product in 2024, Defendants have attracted millions of users around the world and as of November 2025, claim nearly ten million users across more than one hundred countries, including the United States, while marketing Mureka as a one-stop solution for "royalty-free," fully licensed music and lyrics for streaming, advertising, social media, and other commercial uses. Defendants position Mureka to generate music and lyrics "similar" in style, vocals, and instrumentation to trending tracks and reference songs— including via uploads and links to existing recordings—explicitly targeting the same use-cases where independent artists and small labels traditionally license their work. Defendants' subscription- and API-based business models profit

directly from this infringement and from the displacement of licensed music by AI outputs.

8. Defendants' misconduct extends beyond copyright. Mureka offers sophisticated voice-synthesis and voice-cloning capabilities, including tools that design, clone, and deploy human-like singing and speaking voices across multiple languages. On information and belief, Defendants collect, store, and exploit biometric identifiers and voiceprints derived from human performances, including distinctive vocal attributes of artists, without complying with the safeguards required by the Illinois Biometric Information Privacy Act (BIPA). Defendants also misuse artists' voices and identities for commercial gain without consent or adequate disclosure, violating the Illinois Right of Publicity Act (IRPA) and similar protections.

9. Defendants further violate the Digital Millennium Copyright Act by circumventing technological measures that control access to copyrighted works and by removing, altering, or providing false copyright-management information. On information and belief, Defendants' "reference track" and "Describe Song" features encourage users to upload existing commercial tracks or paste links to streaming content (including YouTube links) so that Mureka can analyze and generate songs in the same style. To support these features and to assemble their training corpora, Defendants engage in stream-ripping and other forms of unlicensed ingestion of digital audio in ways that bypass or ignore access controls and strip copyright-management information at scale, frustrating attribution, licensing, and enforcement.

10. Defendants' conduct also constitutes contributory and vicarious infringement, deceptive trade practices, and unjust enrichment. Defendants intentionally induce and materially contribute to downstream infringements by designing and marketing Mureka's ability to create songs and vocals "in the style of" specific artists and reference tracks, while maintaining control over the platform and reaping direct financial benefit from user infringement. Defendants' public claims that Mureka's outputs are "copyright-friendly," "royalty-free," and safe for commercial use are false and misleading, likely to cause confusion regarding sponsorship, affiliation, or approval, and they have unjustly retained enormous value derived from artists' works.

11. No technological breakthrough, no matter how sophisticated, can legally or ethically justify widespread infringement or the systematic violation of creators' rights. Defendants must follow the same basic legal rules as everyone else in the music market, including respecting the intellectual property, biometric, and publicity rights that underpin the creative economy.

12. Unlike lawsuits brought by major labels to protect their superstar catalogs, this case centers on the disproportionate harm Defendants inflict on independent musicians and songwriters. Independent artists make up the vast majority of music creators but lack comparable financial buffers or bargaining power. They depend heavily on licensing income, royalties, commissions, and recognition of their creative works. Defendants' unauthorized use of those works and their saturation of the market with AI-generated substitutes impose especially severe and unequal burdens on independent artists.

13.     Ultimately, this action tests whether the deployment of large-scale AI music systems can coexist with the fundamental protections that make human creativity possible. Plaintiffs seek accountability, a clear repudiation of Defendants' unlawful practices, and a rule-set for the AI era that allows technological innovation while preserving the rights and dignity of the people whose work makes music worth listening to in the first place.

## PARTIES

14.     Plaintiff David "Davo Sounds" Woulard ("Woulard") is a military veteran, an active Chicago Firefighter, and a Chicago-based singer and songwriter. Woulard co-owns or exercises the exclusive control over the copyrights for the sound recordings and musical-composition works (including lyrics) identified in Exhibit A-[Woulard] (together, the "Woulard Works"). The Registered Recordings include, by way of example: "Bad News" (single), Reg. No. SR0000845765, registered March 25, 2019; and "Prequel to the Sound" (collection of seven songs), Reg. No. SRU001313672, registered March 28, 2018.

15.     Woulard is the principal songwriter and lead vocalist for the Indie R&B band Attack the Sound and is a credited songwriter and copyright owner of the band's releases.

16.     Plaintiff Attack the Sound LLC ("ATS") is an Illinois limited liability company.  ATS manages and represents the artists, creative copywriters, masters, and performers who perform under the Attack the Sound name.

Multiple Attack the Sound releases are registered with the U.S. Copyright Office as reflected in Exhibit A-[Woulard].

17.     Since 2019, Attack the Sound has released ten singles and a six-track project, "Love Is War: Packed." Its music is available on major streaming platforms, including Spotify, YouTube, Apple Music, Amazon Music, and Pandora.

18.     Woulard writes and records his vocal performances for Attack the Sound in Illinois.

19.     Attack the Sound maintains a significant social-media presence, including over 15,000 Instagram followers, and actively promotes its releases in the competitive Chicago music market.

20.     Plaintiffs Stan and James Burjek (together, the "Burjek Plaintiffs") are a Shorewood, Illinois-based father-and-son songwriting and recording duo. They've released folk rock and shoegaze music under the names "The Burjek Collective", "Smackin' Billies", and "Pool Deck Duel." Stan is a guitarist, songwriter, and vocalist; James is a multi-instrumentalist.

21.     The Burjek Plaintiffs individually or collectively own, co-own, or exercise the exclusive control over the copyrights for the sound recordings and musical-composition works (including lyrics) identified in Exhibit A-[Burjek] (the "Burjek Works"). Registered sound recordings include, by way of example, "This Road" (album), Reg. No SRU001533131, registered February 8, 2023.

22.     Since 2023, The Burjek Collective, Smackin' Billies and Pool Deck Duel have released multiple singles; the ten-song Smackin' Billies album "This

Road" was released in May 2023. Stan is a credited songwriter and copyright owner of all material by The Burjek Collective, Smackin' Billies, and Pool Deck Duel. Their music is available on major streaming platforms, including Spotify, YouTube, Apple Music, Amazon Music, and Pandora.

23.     Stan recorded vocal parts for many of the songs, including specifically the following songs: This Road, Fire Years, What She's Thinking, Who Would You Be, Lights on our Faces, Dirty Them Dogs, Nothing With You, Rock Salt Hill, This Road Pt. 2 (Epilogue), Man on the Radio, Little Bales of Hay, Perfectly Served. James recorded vocal parts on "How Can You See Love" released by Pool Deck Duel.

24.     All The Burjek Collective, Smackin' Billies and Pool Deck Duel material was recorded at the Burjeks' home studio in Shorewood, Illinois.

25.     Although neither Stan nor James is a full-time musician, their releases have garnered thousands of streams across platforms, and they actively work to expand exposure and streaming revenue.

26.     Plaintiffs Berk Ergoz, Hamza Jilani, Maatkara Wilson, and Arjun Singh (collectively, the "Directrix Plaintiffs") perform as "Directrix", a Chicago-based band. A non-exhaustive list of sound recordings and musical-composition works (including lyrics) owned or exclusively controlled by the Directrix Plaintiffs are identified in Exhibit A-[Directrix].

27.     Directrix began as the passion project of Hamza and Berk nearly ten years ago in Dubai. After moving to Illinois to attend the University of

Chicago, they joined with Wilson and Singh to write, record, perform, and release music.

28.     In March 2023, Directrix released "The Whale Album," a collection of eight songs recorded in 2023. In July 2025, they released a five-song project, "Halotherapy." Both projects, along with the July 2023 single "(I Don't) Wanna Fall in Love", were recorded in Chicago, Illinois. Berk, Hamza, Maatkara, and Arjun are all listed as credited songwriters and copyright owners of this material.

29.     Directrix distributes its music to major streaming platforms, including Spotify, Apple Music, Amazon Music, YouTube, Pandora, and Tidal, through digital distributor EmuBands.

30.     Members of Directrix recorded vocal parts across these releases, including: Buttermilk (main vocals: Plaintiff Maatkara, backing vocals: Plaintiff Hamza), The Breaching Song (main vocals: Plaintiff Maatkara, backing vocals: Plaintiffs Hamza, Berk, Maatkara), Hell's Breeze (main vocals: Plaintiff Hamza, backing vocals: Plaintiffs Maatkara, Hamza, Berk), Trick Mirror (main vocals: Plaintiff  Maatkara, backing vocals: Plaintiffs Hamza, Maatkara), (I Don't) Wanna Fall in Love (main vocals: Plaintiff Maatkara, backing vocals: Plaintiff Hamza).

31.     Berk, Hamza, Maatkara, and Arjun are all listed as credited songwriters and copyright owners of this material.

32.     While not full-time musicians, the Directrix Plaintiffs have accrued thousands of Spotify streams (and more across other platforms) and earn a modest revenue stream from both streaming and live performances.

33.     Plaintiff Magnus Fiennes is a Los Angeles-based, award-winning composer and producer whose work spans film, television, theatre, and video games. He has composed more than 240 hours of music, including the BBC's hit series "Death in Paradise," which he has scored for 15 seasons and continues to score, and its spin-off "Beyond Paradise," to which he has contributed 4 seasons, with work ongoing. His other notable credits include the acclaimed dramas "Hustle," "Murphy's Law," and "The Last Enemy," as well as the feature film "Onegin" and the animated project "Casper's Scare School."

34.     Fiennes' achievements include winning Best Music at the Reims International TV Awards for "Five Days" and composing music for hundreds of successful commercial campaigns for brands such as Coca-Cola, Ford, Kraft, and L'Oréal. He has also produced and written for major artists including Shakira, Tom Jones, Lenny Kravitz, Sinéad O'Connor, and the Spice Girls, contributing to hits such as the global number one "Never Ever" by All Saints.

35.     Fiennes created and owns the music rights to "Freefonix," a children's animated series of 40 episodes (BBC Worldwide, 2007). All episodes are available on YouTube. The series features more than 80 songs co-written by Fiennes. Fiennes also composed the music and owns all music publishing and master recording rights for the feature films "Robots" (2024, NEON) and "Pervert's Guide to Ideology" (Zeigler Films, 2011).

36.     A non-exhaustive list of sound recordings and musical-composition works (including lyrics) owned or exclusively controlled by Plaintiff Fiennes are identified in Exhibit A-[Fiennes]. Fiennes' registered recordings include, by way of example, "Let armies loose", Registration No. PAu002889490, registered August 8, 2020.

37.     Fiennes releases music on major streaming platforms, including Spotify, Apple Music, Amazon Music, YouTube, and Pandora.

38.     Plaintiff Michael Mell, who records and produces music under the name "Mic Mell," is an Atlanta-based songwriter and producer who owns or exercises the exclusive control over the copyrights for the sound recordings and musical-composition works (including lyrics) identified in Exhibit A-[Mell] (the "Mell Works"). Mell is the principal songwriter and recording artist for all works released as Mic Mell.

39.     Mell wrote and recorded the 12-song project "Muff-ucker" (2006) and the 13-song project "Low Blood Sugar" (2010). He has also released music as "Barcode Lounger" and "Funkanetics," including the 2006 Funkanetics single "All In A Day's Work Part I," and the 2006 Barcode Lounger album "Tech Support, Vol. 2 (Remastered) – EP." A non-exhaustive list of sound recordings and musical-composition works (including lyrics) owned or exclusively controlled by Mell are identified in Exhibit A-[Mell].

40.     Mell's projects have been published to major streaming platforms, including Spotify, Apple Music, Amazon, Pandora, and Tidal.

41.     Defendant Kunlun Tech Co., Ltd. ("Kunlun") is a corporation organized under the laws of the People's Republic of China, with its principal place of business at Block B, Mingyang International Center, No. 46 Xizongbu Hutong, Dongcheng District, Beijing 100005, People's Republic of China. Kunlun is a publicly traded global internet company listed on the Shenzhen Stock Exchange and, directly or through its subsidiaries and affiliates, owns, controls, and operates the AI music and audio platform known as "Mureka" that is at issue in this case.

42.     Defendant Skywork AI Pte. Ltd. ("Skywork") is a private company limited by shares organized under the laws of Singapore, with its registered office at 2 Science Park Drive, #01-08, Ascent, Singapore 118222 and, on information and belief, its principal place of business is in Singapore. Skywork is owned by the Kunlun Tech and develops artificial-intelligence-generated-content software and applications and, directly or through its parents and affiliates, owns, controls, and operates the AI music generation platform branded as "Mureka" that is at issue in this case, including by acting as the contracting entity in Mureka's Terms of Service and privacy policy, and as the listed developer and publisher of the Mureka mobile applications distributed through major app stores in the United States and around the world. The contracts by which Defendants profit from Plaintiffs' biometrics were formed in the United States.

43.     Unknown Defendants are individuals or entities who either directly infringed on Plaintiffs' federally copyrighted sound recordings or knowingly

induced or materially contributed to Defendants' infringement. These defendants knowingly helped, facilitated, or significantly contributed to Defendants' infringement by collecting, scraping, copying, or acquiring copyrighted sound recordings for inclusion in Defendants' AI training data. Additionally, these unknown defendants actively encouraged or supported Defendants' infringing activities by providing vital resources, tools, or assistance and/or directly supervised and financially benefited from Defendants' unlawful conduct. Once the identities of these Unknown Defendants are discovered, Plaintiffs will amend this Complaint and serve notice on the identified persons or entities.

## **JURISDICTION AND VENUE**

44.     This civil action seeks damages and injunctive relief for copyright infringement under the Copyright Act, 17 U.S.C. §§ 101 et seq., removal or alteration of copyright management information and circumvention of technological measures under the Digital Millennium Copyright Act, 17 U.S.C. §§ 1201–1202, and related federal claims, as well as state-law claims arising from the same course of conduct. Accordingly, this Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1338(a). In addition, this Court has jurisdiction under 28 U.S.C. § 1332(a)(2) and the Class Action Fairness Act, 28 U.S.C. § 1332(d), because: (a) this is a proposed class action in which there are at least 100 class members; (b) at least one defendant is a citizen of a foreign

state and all plaintiffs are citizens of states of the United States; and (c) the amount in controversy exceeds $5,000,000, exclusive of interest and costs.

45.     This Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) over Plaintiffs' and the Classes' state-law claims—including, without limitation, claims under the Illinois Biometric Information Privacy Act ("BIPA"), 740 ILCS 14/1 et seq.; the Illinois Right of Publicity Act ("IRPA"), 765 ILCS 1075/1 et seq.; the Illinois Uniform Deceptive Trade Practices Act ("UDTPA"), 815 ILCS 510/1 et seq.; and Illinois unjust-enrichment law—because those claims are so related to the federal claims that they form part of the same case or controversy under Article III. The state-law claims arise from the same nucleus of operative facts as the federal copyright and DMCA claims, namely Defendants' acquisition, copying, ingestion, training, commercialization, and biometric exploitation of Plaintiffs' and class members' recordings, lyrics, identities, and voiceprints. Exercising supplemental jurisdiction promotes judicial economy, convenience, and fairness to the parties. Those state-law claims include, without limitation:

a.  the Illinois Biometric Information Privacy Act ("BIPA"), 740 ILCS 14/1 et seq.;

b.  the Illinois Right of Publicity Act ("IRPA"), 765 ILCS 1075/1 et seq; and

c.  any other state-law claims asserted (e.g., unjust enrichment under Illinois law) arising from the same nucleus of operative facts, namely, Defendants' acquisition, copying, ingestion, training, and commercialization of

15

Plaintiffs' and Class members' recordings, lyrics, identities, and biometric identifiers/voiceprints.

46.     This Court has personal jurisdiction over Defendants because they have deliberately and continuously exploited the Illinois market and have purposefully directed suit-related conduct into Illinois and this District, and Plaintiffs' claims arise out of or relate to those Illinois contacts; exercising jurisdiction is consistent with fair play and substantial justice. Defendants' contacts with the United States and this District are not random, isolated, or fortuitous, but are the predictable result of Defendants' deliberate and ongoing efforts to cultivate and profit from a U.S. user base for Mureka that includes Illinois residents and devices located in Illinois. Defendants' Illinois- and District-related contacts include, without limitation:

a.     Defendants own, control, and operate Mureka[1], a highly interactive commercial AI music generation platform and API that is continuously accessible in the United States, including in Illinois and in this District, and that allows users in Illinois to open accounts; input text, lyrics, and audio; generate full-length songs with vocals and instrumentals; download or otherwise access those tracks; and use them in commercial projects. Defendants do not meaningfully restrict or geoblock access by Illinois users and expressly include Illinois as part of their intended customer base for Mureka's services. On information and belief, Defendants track and log user access by IP address and other identifiers sufficient to determine that Illinois

---

[1] https://www.mureka.ai/

users repeatedly access, upload content to, and download outputs from Mureka while located in Illinois.

   b.    Defendants distribute the "Mureka – AI Music Generator" mobile application through the United States Apple App Store and Google Play Store, where Mureka is listed in the U.S. storefront, categorized under Music, and offered with multiple paid "Pro" and "Basic" subscription plans denominated in U.S. dollars (including weekly, monthly, and yearly options), thereby entering into repeated, ongoing commercial transactions with U.S. residents, including Illinois residents of this District, through contracts formed and repeatedly performed here (including renewals and ongoing access during paid subscription periods). On information and belief, Illinois residents purchase paid subscriptions while physically present in Illinois and assent to Mureka's Terms of Service in Illinois, creating ongoing contractual relationships with Defendants in Illinois.

   c.    Through the Mureka API and platform, Defendants use cloud-service, payment-service, and analytics providers to collect and analyze information such as how often users visit the service, what they do on the service, device identifiers, session data, and the locations from which they log in. On information and belief, Defendants maintain ordinary-course business records and internal metrics that segment and quantify accounts, paid subscribers, revenue, retention, and usage volume by geography (including by state and/or metropolitan area), including Illinois and this District.

d.     Server web application code on mureka.ai initializes users'
sessions and accounts through a global application state object (e.g.,
window.__INITIAL_STATE__) that includes persistent account identifiers (such
as a stable user ID and UUID), session identifiers, activity timestamps, and
network/location fields (including the user's registration IP address and
country/region code). These fields show that Defendants collect, store, and use
IP-based location information and can readily determine when users in the
United States—including users in Illinois—create accounts, log in, and use
Mureka from within this District.

e.     Defendants, as evident in their publicly available HTML
source code, embed and execute Microsoft Advertising's Universal Event
Tracking ("UET") tag on their web properties, which is designed to record what
visitors do on a website so that the advertiser can track conversions and build
remarketing audiences. Defendants have configured the UET tag to
automatically track navigation and interactions within a single-page
application environment (via enableAutoSpaTracking), demonstrating
Defendants' deliberate and ongoing tracking of users' in-service conduct and
conversion activity as they use Mureka from Illinois and other U.S. locations.

f.     Defendants, as evident in their publicly available HTML
source code, embed and execute the Yandex Metrica analytics tag and initialize
it with settings consistent with e-commerce/event instrumentation (including
an e-commerce 'dataLayer'), reflecting Defendants' intent to measure
engagement and conversions by geography, including from Illinois.

g.      Defendants, as evident in their publicly available HTML source code, deploy affiliate/referral attribution technology (including Rewardful), which is designed to be installed across an application and marketing pages so the operator can track visits, leads, and conversions and attribute those conversions to referrers/affiliates. Defendants' use of affiliate attribution tooling reflects deliberate cultivation of a U.S. customer base and the tracking of subscription signups and payments from users located in Illinois and throughout the United States.

h.      On information and belief, Defendants integrate third-party authentication and identity services into Mureka's onboarding and account system, including social login software development kits and Apple Sign-In configured to request users' name and email address. These identity integrations enable Defendants to form ongoing, identity-linked account relationships with U.S. residents and to associate those accounts with users' usage, uploads, purchases, and location signals derived from IP address and related network data.

i.      Defendants, as evident in their publicly available HTML source code, deploy client-side error and performance monitoring instrumentation that records and queues early errors and performance timing events for later reporting to an error/observability vendor (such as Sentry). Such monitoring tools capture and transmit telemetry tied to users' browsing sessions and device context, and Sentry-style tooling captures unhandled errors through global browser error handlers. Defendants use this telemetry to

19

monitor and optimize Mureka's real-time delivery of audio outputs to U.S. users, including Illinois users.

j.      By embedding persistent identifiers and location/network fields in their web application state and by deploying conversion tracking, remarketing, affiliate attribution, and session analytics tools across Mureka's web properties, Defendants do not merely operate a passive site accessible from Illinois; they systematically solicit, track, measure, and monetize repeated use by U.S. users, and they can readily determine and exploit the presence of Illinois users in this District. Plaintiffs' claims arise out of or, at minimum, relate to these Illinois-triggered transactions, data collection, and ongoing subscriber relationships.

k.      Defendants explicitly single out "users in the United States" in their policies and state that, for such users, Mureka is not directed to minors under 13; provide a "Special notice to California residents" that defines "Personal Data" in the same terms as "Personal Information" under the California Consumer Privacy Act; grant California residents rights under California's Shine the Light law and the CCPA; and offer a "Do Not Sell My Personal Data" opt-out, thereby acknowledging and affirmatively structuring their business around a substantial and ongoing California and U.S. user base.[2] These U.S.-facing policy representations and privacy controls are presented to, and used by, Illinois residents in this District, and reflect

---

[2] https://www.mureka.ai/static/privacy-20250709.pdf

Defendants' expectation and exploitation of substantial ongoing U.S. state-by-state consumer traffic, including from Illinois.

l.      On information and belief, Defendants maintain restrictions, guardrails, and moderation/compliance systems that are applied, configured, or tuned based on user location and regulatory compliance, including for U.S. users and users located in Illinois, reflecting Defendants' expectation of—and operational responsiveness to—state-specific U.S. usage.

m.      Defendants intentionally collect, store, and process the recordings, text, and "voice data," including unique vocal characteristics and voice samples, uploaded by users worldwide and in the United States, including Illinois users and Illinois residents in this District, for the purpose of generating AI music outputs and voice-based content. On information and belief, Defendants collect such voice and audio data from Illinois residents when those residents record or upload audio from within Illinois and, as part of Defendants' ongoing performance of their paid service for Illinois customers, Defendants receive those Illinois-originating uploads and transmit Mureka-generated outputs back into Illinois. Mureka's policies state that they collect user-generated content, audio references, and "unique voice samples," and that they may use those recordings to create AI music outputs containing a user's "unique vocal characteristics."

n.      Defendants collect, store, and use personal data from U.S. users—including purchase history, user-generated content, audio data, identifiers, usage data, and diagnostics—for analytics, targeted advertising, and

app functionality, and share U.S. users' registration information, country/region designation, and IP address with third-party payment processors and advertising partners in connection with Mureka-related transactions. On information and belief, Defendants' subscription purchase flows and payment processing collect and process billing and transaction metadata sufficient to charge and renew payments, including information that identifies Illinois subscribers (e.g., billing address, ZIP code, country/region designation, and/or IP-based location signals), and Defendants knowingly profit from recurring Illinois commerce.

o.     Defendants maintain a U.S. presence and workforce focused on Mureka and related AI products, including Skywork AI's public identification of a San Francisco, California office and Mureka research and engineering personnel based in the San Francisco Bay Area whose work on Mureka's music-generation models and infrastructure is performed from within the United States. That U.S.-based workforce and infrastructure supports and services Mureka's paying customer relationships nationwide, including ongoing subscriber relationships with users located in Illinois, and enables the delivery of Mureka outputs into Illinois on a continual basis.

p.     Defendants publicly position Mureka as a "full-stack" AI music generation platform and market it to businesses, brands, and content creators seeking royalty-free music for marketing, games, advertising, film, podcasts, YouTube videos, TikTok, and other commercial media, including by promoting Mureka as a way to avoid "copyright strikes" on major online

22

platforms that are central to U.S. music distribution. This marketing is disseminated into Illinois through the same online channels by which Defendants solicit U.S. users, and on information and belief reaches and is designed to attract Illinois-based creators, businesses, and consumers to generate and commercially exploit outputs in Illinois. Additionally, Defendants encourage users to publish, share, and disseminate Mureka-generated outputs on third-party platforms and distribution channels, resulting in outputs generated through Mureka by users in Illinois being distributed into Illinois and publicly disseminated from Illinois.

q.      Defendants publish marketing and "education" content specifically addressing "AI Music Copyright Laws 2025" and "U.S." musicians, repeatedly discussing the United States Copyright Office, U.S. federal courts, and U.S. legislation, and touting Mureka's "full commercial licensing rights" as a way for musicians to register and enforce their rights in U.S. and international markets, thereby directly courting U.S. creators and rights-holders, including Illinois residents, to use Mureka in connection with U.S. law and U.S. enforcement mechanisms. Defendants distribute this U.S.-law-focused content to U.S. audiences that include Illinois residents, encouraging Illinois musicians and creators to use Mureka for Illinois-based commercial projects and to rely on Defendants' claimed licensing/ownership framework.

r.      Defendants operate an online Mureka library and marketplace where users, including U.S. users can store, manage, and trade

Mureka-generated songs and related assets, and on information and belief Mureka also stores user accounts, settings, generation history, and libraries such that Illinois users repeatedly access their accounts and content from Illinois as part of a continuing course of Illinois-directed service performance. On information and belief, Illinois account holders participate in this library/marketplace from within Illinois, and Defendants issue licenses and facilitate monetization in continuing relationships with Illinois users.

s.      Defendants route U.S. user traffic, including uploads of recordings and downloads of generated tracks, through local servers in the United States such that the copying, processing, and delivery of Plaintiffs' and Class members' recordings, lyrics, and vocal identifiers occur, in significant part, on U.S. infrastructure. For Illinois users, this includes traffic originating in Illinois and returning to Illinois, such that Defendants repeatedly transmit, process, and deliver the relevant audio and outputs into and out of Illinois as part of their Illinois-facing commercial service.

t.      Defendants use the same U.S.-facing Mureka infrastructure, models, and data pipelines identified in the prior subparagraph to ingest, copy, process, and commercially exploit Plaintiffs' and Class members' recordings and vocal identities—including works created, owned, or exploited in Illinois— and to deliver competing AI-generated tracks into the U.S. market in direct competition with Plaintiffs' works; Plaintiffs' claims thus arise directly from, or at a minimum relate to, Defendants' U.S. contacts. Those contacts include Defendants' Illinois-directed provision of Mureka to Illinois users and the

24

resulting collection, processing, and monetization of Illinois residents' audio/voice data and Illinois-exploited works.

u.     Defendants' recurring Illinois subscription revenue and Illinois-directed monetization are driven in material part by Mureka's ability to generate high-fidelity, human-like, and voice-simulative outputs that Plaintiffs allege infringe and exploit Plaintiffs' works, identities, and biometric voiceprints.

v.     Defendants intentionally cultivate a U.S. customer base for Mureka, as reflected in Mureka's rankings in the U.S. app stores and the thousands of ratings and reviews posted on the United States Apple App Store, which confirm repeated, successful sales and subscriptions to U.S. residents. On information and belief, Defendants' U.S. customer base includes Illinois residents, including within this District, who downloaded the app, created accounts, purchased subscriptions, uploaded audio/voice data, and downloaded Mureka-generated tracks while located in Illinois, generating recurring revenue and Illinois-directed data collection central to Plaintiffs' claims.

w.     On information and belief, Defendants knowingly collected and processed biometric voice data from Illinois residents located in Illinois, including Plaintiffs and Class members, and did so as part of monetized subscriber relationships with Illinois residents—conduct that is jurisdictionally significant because the unlawful collection and resulting injury occurred in Illinois. In connection with those ongoing relationships, Defendants send

transactional communications (including account confirmations, receipts, subscription renewals, password resets, and feature notices), provide customer support, and maintain support records reflecting recurring interactions with Illinois customers; and Defendants' web and mobile services use cookies, analytics SDKs, and similar tracking technologies—and, for mobile applications, push notifications and similar mechanisms—to communicate with and collect usage data from devices located in Illinois.

      x.    Defendants operate and deliver the Mureka web platform through U.S.-based server infrastructure and network endpoints (including the mureka.ai endpoint described below). Publicly available DNS records show that the primary domain for the service, mureka.ai, resolves to the IPv4 address 47.253.118.92. Public IP-lookup tools identify that IP address as a data-center/transit address assigned to Alibaba Cloud LLC and geolocated in the United States (Virginia). Accordingly, when users in the United States— including users in Illinois and in this District—access Mureka through mureka.ai, their requests, log-in credentials, prompts, uploads, and downloads are transmitted to and from U.S.-geolocatedIP endpoints that on information and belief, Defendants own, lease, control, or cause to be operated on their behalf, and Defendants' U.S.-directed service performance occurs, in significant part, through U.S. endpoints.

      y.    Defendants maintain the mureka.ai domain and the operational ability to deliver the service to U.S. users through ongoing relationships with U.S. vendors. Public WHOIS and DNS information for

mureka.ai identifies the domain's registrar as GoDaddy.com, LLC and its nameserver infrastructure as ns03.domaincontrol.com and ns04.domaincontrol.com, reflecting that Defendants have purposely established and maintained U.S.-based commercial relationships that are necessary to operate, publish, and continuously deliver the Mureka service to users in the United States, including Illinois.

47.     By operating a highly interactive, subscription-based commercial platform; repeatedly contracting with and receiving payment from Illinois residents; tracking and segmenting Illinois usage; delivering Mureka outputs into Illinois in response to Illinois-originating inputs; and deliberately cultivating U.S. creators, businesses, and audiences for Mureka-generated music, Defendants have done far more than maintain a passive website. Their Illinois contacts are substantial and suit-related, and Defendants could and should reasonably anticipate being sued in this Court for harms caused by their Illinois-directed conduct. Exercising jurisdiction is fair and reasonable because Illinois has a strong interest in redressing unlawful biometric and identity exploitation of Illinois residents and unlawful commercialization that harms Illinois commerce; Plaintiffs have a strong interest in obtaining relief in Illinois for claims that arise out of Defendants' Illinois-directed subscription commerce and delivery of outputs and services into Illinois; the burden on Defendants is not undue given Defendants' intentional U.S. commerce and ongoing subscriber relationships; and litigating in Illinois promotes efficient

resolution because Illinois statutory claims, Illinois-based plaintiffs, evidence, and market impacts are central to the dispute.

48. In addition, and in the alternative for Plaintiffs' federal claims (including claims under the Copyright Act and the DMCA), this Court may exercise personal jurisdiction over Defendants pursuant to Federal Rule of Civil Procedure 4(k)(2). Plaintiffs' federal claims arise under the laws of the United States; Defendants are foreign corporations not domiciled in any state; and, to the extent Defendants contend they are not subject to jurisdiction in the courts of general jurisdiction of any particular state, Defendants have more than sufficient contacts with the United States as a whole to satisfy due process. Those nationwide contacts include, but are not limited to, operating Mureka for a large and growing U.S. user base; deploying U.S. servers; contracting with U.S. payment processors; distributing their apps through U.S. app stores; collecting and processing the personal data, voice data, and usage data of U.S. users; and targeting U.S. creators and businesses with promises of "royalty-free" commercial music for U.S. platforms. Those nationwide contacts also include operating the principal mureka.ai web endpoint through U.S.-based hosting and network infrastructure (as shown by public DNS and IP-lookup records), maintaining U.S. domain-operations relationships necessary to deliver the service to U.S. users, and deploying third-party marketing and attribution technologies designed to acquire, track, and monetize U.S. subscribers. Exercising jurisdiction under Rule 4(k)(2) is fair and

reasonable in light of the deliberate, large-scale nature of Defendants' U.S. contacts and the foreseeability of harm to U.S. rights-holders.

49.    This Court has personal jurisdiction over Defendants with respect to Plaintiffs' Illinois-law claims, including BIPA, IRPA, UDTPA, and unjust-enrichment claims, because Defendants' challenged conduct was directed at and caused injury in Illinois and occurred primarily and substantially in this state as to Illinois plaintiffs and subclass members. Among other things, Defendants: (a) knowingly collected, captured, and stored Illinois residents' voice data, voiceprints, and vocal identifiers when Illinois users uploaded recordings and used Mureka's voice and music-generation tools; (b) used those biometric identifiers to train, operate, and commercialize models that reproduce or simulate those voices without the notice, consent, and other safeguards BIPA requires; (c) used Illinois artists' names, voices, and distinctive vocal characteristics for commercial purposes in Illinois without written consent, including to promote and sell Mureka subscriptions; and (d) directed deceptive marketing and "royalty-free" assurances into Illinois, causing confusion and harm in this District. Plaintiffs residing and conducting business in Illinois suffered the brunt of these injuries here.

50.    Venue is proper in this District because Defendants are foreign corporations and therefore "may be sued in any judicial district," 28 U.S.C. § 1391(c)(3). Venue is also proper in this District as to Plaintiffs' Title 17 claims (including claims under the Copyright Act and the DMCA) pursuant to 28 U.S.C. § 1400(a) because Defendants "may be found" in this District in that

Defendants are amenable to personal jurisdiction here for those claims and because the acts giving rise to those claims include Defendants' distribution, delivery, and provision of infringing and voice-simulative outputs into this District through Mureka's website, mobile applications, and API. Venue is further proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District. This District is a convenient and appropriate forum for this dispute. Without limitation:

a. Defendants' subscription service is performed in this District through repeated interactive sessions initiated from this District, including prompts, uploads, and other user inputs transmitted from Illinois devices, and Defendants' generation and transmission of outputs back into Illinois.

b. Defendants deliver AI-generated music files and related digital outputs into this District, and to the extent Mureka makes outputs available for playback, streaming, or downloading, those acts occur in this District when Defendants transmit those outputs to users and devices located here.

c. Defendants' subscription commerce includes billing, renewal, and transactional communications with users in this District, and Defendants' platform stores and serves account data, generation history, and output identifiers for users who access Mureka from this District.

d. Defendants' Illinois statutory violations occurred in this District because Defendants collected, captured, stored, and commercially used Illinois residents' biometric voice data and identity attributes in connection with

30

Mureka's services and commercialization in Illinois, and Defendants disseminated voice-simulative outputs to and within Illinois as part of ongoing service performance and subscription commerce.

e. Defendants' deceptive marketing and "royalty free" and licensing representations were disseminated into this District, relied on by Illinois users, and caused confusion and harm here.

f. Plaintiffs' works, recordings, and commercial interests are centered in Illinois, and Plaintiffs suffered substantial market and statutory harms in this District.

g. Litigating these claims together in this District promotes judicial economy and avoids fragmentation because the federal and Illinois-law claims arise from the same nucleus of operative fact and the same course of conduct.

## FACTUAL BACKGROUND

51.     Plaintiffs are independent artists and producers who own or exclusively control valuable copyrights and related rights in numerous sound recordings. Exhibit A, which is attached and incorporated by reference, includes a non-exhaustive sample of the copyrighted sound recordings (the "Copyrighted Recordings") that Defendants have infringed. Sound recordings in Exhibit A that were registered with the U.S. Copyright Office are specifically identified.

*Mureka's Launch in 2024 and Rapid Global Growth*

52.     Mureka is an AI music creation platform developed and operated by SKYWORK AI PTE. LTD., a Singapore company that is part of the Kunlun

Tech corporate group. Public materials describe Skywork AI as "backed by Kunlun Tech," a large Chinese technology conglomerate whose $7 billion USD business spans content, entertainment, artificial general intelligence (AGI), and AI-generated content (AIGC) products worldwide.

53.     Kunlun Tech publicly claims that its AI division, Skywork AI, developed the Mureka model family and has rapidly iterated through multiple commercial models. Earlier generations included "Mureka V5.5," marketed as an enhanced multi-language music-generation model, and "Mureka V6," described as a higher-quality general-purpose creation model suitable for professional-level production. Building on those versions, Skywork launched "Mureka O1," which Kunlun promotes as the world's first "music reasoning" large model and claims outperforms competing systems such as Suno V4 on metrics like mixing quality, vocal textures, and background instrumentation. In 2025, Skywork released "Mureka V7" and then "Mureka V7.5," which Defendants describe as their latest flagship models, emphasizing improved melodic development, arrangements, human-like vocals, lyric articulation, emotional expression, and faster, more scalable generation. Defendants further highlight that Mureka V7.5 has been used to release "Digital Heartbeat," which they promote as the world's first fully AI-generated global single, underscoring that Mureka's business model is to deliver radio-ready, AI-created music intended to compete directly with human-made recordings. Most recently, in late 2025, Skywork introduced "Mureka V7.6" and an updated "Mureka O2" model, which Kunlun touts as ushering in a new era of AI music creation by

further boosting generation speed, stability, arrangement complexity, and near-professional audio quality for large-scale commercial music applications.

54.     Kunlun and Skywork describe Mureka as a core part of Kunlun's global AI music ecosystem alongside "Melodio," an AI music streaming platform powered by the same underlying SkyMusic large language model. These products are marketed as enabling fully AI-generated music experiences, from real-time AI streaming on Melodio to on-demand track creation, editing, and distribution on Mureka.

55.     According to Kunlun and Skywork, since its public launch in 2024 Mureka has been accessed by users from "more than 100 countries and regions" and by  late 2025, has grown to nearly 10 million users worldwide. Kunlun's press releases and independent coverage repeatedly emphasize Mureka's rapid adoption and its role in Kunlun's strategy to scale AI music products globally.

56.     Kunlun promotes Mureka as a "global leader in AI music creation" and highlights that its team is among the few worldwide capable of independently developing large-scale music generation models, emphasizing that Mureka is a flagship, not an experimental product.

57.     Mureka is offered through a web interface (mureka.ai), an API platform at platform.mureka.ai, Melodio as an AI-powered music-streaming platform, and mobile applications distributed through major app stores, including Apple's App Store and Google Play. Mureka's app-store listings

identify SKYWORK AI PTE. LTD. as the publisher and present Mureka as an AI song and music maker for global users, including those in the United States.

58.     Kunlun's investor-facing materials emphasize that Kunlun has a "global presence spanning over 100 countries and regions," with hundreds of millions of monthly active users across its various products, and describe Mureka and Melodio as key AI music offerings deployed within this global footprint.

*How the Mureka Platform Works and Where It Competes*

59.     Mureka's consumer platform allows users to generate complete songs—including lyrics, instrumentation, and vocals—from simple text prompts specifying genre, mood, tempo, language, and other parameters. Mureka advertises that users can create "studio-quality," "original" tracks in seconds with "no musical skill needed."

60.     Mureka also enables users to upload "reference tracks" and other audio to guide generation. Kunlun's and third-party descriptions of the platform explain that on the Mureka "Create" page, users can input lyrics, upload or link to reference tracks (including from YouTube), and control music styles via a "Style" function, with Mureka generating songs that follow the structure of intros, verses, choruses, bridges, and outros.

61.     Mureka's site describes its AI music generator as analyzing "millions of songs to understand patterns" and using those learned patterns to generate new tracks tailored to the user's instructions. This framing

acknowledges that Mureka's models are trained on enormous corpora of existing music recordings and compositions.

62.     Beyond the consumer platform, Mureka operates a dedicated API service for developers and businesses. Mureka's API documentation explains that clients can integrate "Song Generation," "Instrumental Generation," "Lyrics Generation," "Song Extension," "Text-to-Speech," and related features directly into their own products and services. The API uses the same production models as Mureka's core consumer product.

63.     Mureka markets three main B2B offerings: (a) a standard music generation API, (b) "model fine-tuning," where a client provides at least 200 tracks in a particular style to create a dedicated model that reproduces that style at scale, and (c) a "content service" under which Mureka delivers ready-made AI music tracks for streaming and video uses.

64.     For content-service clients, Mureka touts its ability to generate music "similar" in style, vocals, and instrumentation to "trending tracks," explicitly promising that it can quickly produce sound-alike material to respond to viral trends and reduce music-licensing costs for platforms that would otherwise license music from human artists and labels.

65.     Mureka repeatedly tells users that every track generated on the platform is "100% royalty-free" and comes with "full commercial rights" or a "commercial license" suitable for use on YouTube, TikTok, Instagram Reels, podcasts, streaming services, advertising, and other commercial projects.

These assurances appear across Mureka's main marketing site and in multiple dedicated landing pages and FAQs.

66.    Mureka markets itself explicitly as a drop-in replacement for licensed music libraries, promising users they can "stop stressing" about copyright, avoid "copyright headaches," and safely bypass the need to clear rights by relying on Mureka's AI-created catalog for sync, background, and production uses.

67.    Mureka's own content emphasizes key use cases that overlap directly with markets where independent artists, including Plaintiffs, earn income: sync licensing for video and advertising, stock and library music, social-media and streaming content, podcasts, games, and other commercial productions that would otherwise license human-made music.

68.    Mureka further promotes features that allow users to extend existing tracks, generate "instrumental" or "beat-only" variants, and create vocal performances from user-supplied lyrics. These tools are promoted as enabling "professional vocal performances" and "breathtaking" instrumental arrangements without hiring singers, producers, or session musicians, placing Mureka in direct competition with the services Plaintiffs provide.

*Mureka's Corporate Structure, Servers, and U.S.-Facing Operations*

69.    Mureka's API Service Agreement and API Platform Privacy Policy identify SKYWORK AI PTE. LTD. as the contracting entity and list a Singapore business address. At the same time, public registry and domain-registration data tie Skywork AI directly to Kunlun Tech through shared corporate branding

("Skywork AI, Kunlun Inc."), shared email domains (@kunlun-inc.com), and Kunlun's own description of Skywork AI as its controlled AI subsidiary.

70.    Mureka's sells access via APIs to its US-based servers, stating that Mureka "deploy[s] local servers in the United States" and that its services collect and process data from U.S. users, including payment and usage information. The policy contains a detailed section addressing U.S. minors, California residents, and U.S. "Do Not Sell My Personal Data" rights under the California Consumer Privacy Act. Mureka thereby actively targets and operates in the U.S. market, availing itself of U.S. infrastructure to provide its services.

71.    Mureka's API Service Agreement requires customers to pay fees in U.S. dollars, with specific tax treatment for users "in the US and Canada." It also provides that U.S. users' fees are "exclusive of taxes," and that billing and place-of-supply determinations depend on the customer's account address, reflecting Mureka's expectation that it will bill and receive revenue from U.S. customers.

72.    Public app-store listings for the "Mureka – AI Song & Music Maker" mobile app show that Mureka is distributed in the United States and other major markets. Reviews and marketing materials explicitly address concerns about copyright claims on platforms such as YouTube and highlight Mureka's promise that users "own 100% of the rights" or receive full commercial licenses for tracks generated through the service.

73.    In short, Defendants position Mureka as a global AI music factory using U.S.-based infrastructure to supply "royalty-free" substitutes for human-

created recordings, including for U.S.-based creators, businesses, and platforms that would otherwise license music from artists such as Plaintiffs.

*Generative AI Music Systems Like Mureka*
*Depend on Copying Existing Recordings*

74.     Generative AI music models do not compose music in a vacuum. As the U.S. Copyright Office and industry commentary have explained, training generative AI systems requires making and processing large numbers of copies of existing recordings and compositions so the model can learn statistical patterns of melody, harmony, rhythm, timbre, lyrics, and arrangement.

75.     Industry-leading AI music systems, including those promoted as trained on "licensed" catalogs, typically rely on tens of thousands of hours of recorded music, encompassing hundreds of thousands or millions of individual audio files, to reach commercial quality. These training datasets, by design, encode detailed expressive features of the underlying works and allow models to reproduce stylistic and sonic characteristics of the music on which they were trained.

76.     Mureka describes its system in these terms. On its official site, Mureka explains that its AI music generator "analyzes millions of songs" to understand musical patterns and then uses those learned patterns to generate "original" tracks that match user-specified genres, moods, and structures. In other words, Mureka's models are trained on vast corpora of existing recordings and compositions, not on abstract music theory.

77.     Defendants promote Mureka's models as capable of producing long-form songs (up to six minutes or more) with realistic vocals and

instrumentation across genres such as jazz, electronic, pop, country, and R&B, in multiple languages, and with finely controlled song structure. These capabilities, as Defendants themselves boast, rival or "outperform" other leading AI music systems that are already being sued for mass copyright infringement.

78.     Mureka and Kunlun do not publicly disclose the specific recordings, catalogs, or datasets used to train Mureka's models. Plaintiffs therefore cannot yet identify every path by which their works were copied into Defendants' training corpora and pipelines. However, Defendants' own statements about "analyzing millions of songs," combined with Mureka's ability to generate high-fidelity outputs that match particular genres, vocal textures, and production styles, make clear that the models were trained on large quantities of real, human-created music.

79.     On information and belief, the Copyrighted Recordings listed in Exhibit A are among the recordings that Defendants reproduced, ingested, and used during pre-training, training, and/or fine-tuning of Mureka's music models, and Defendants retain those copies (or their encoded representations) in centralized training corpora, intermediate files, model parameters, and/or other storage beyond any transient technical need.

80.     As with other generative AI systems, Defendants' first act of infringement occurs when they copy Plaintiffs' Copyrighted Recordings into training datasets and intermediate representations. Every subsequent training run, model update, fine-tuning pass, or derivative model that relies on those

copies constitutes additional unauthorized reproduction and use of Plaintiffs' works.

81.    Because Mureka markets its outputs as royalty-free substitutes for licensed music and encourages their use in sync, streaming, library, and background-music markets, Defendants' conduct does not merely exploit Plaintiffs' recordings behind the scenes. It also directly competes with Plaintiffs in downstream markets, depresses licensing prices, and undermines the economic value of Plaintiffs' catalogs by flooding the market with AI-generated substitutes built on unlicensed copying.

*Mureka's "Royalty-Free" and "Copyright-Friendly" Branding*

82.    Even as Defendants rely on large-scale copying of existing music to train Mureka's models, they aggressively assure users that Mureka's outputs are "copyright-friendly," "royalty-free," and "safe" for commercial use. Mureka's marketing hub includes articles on "AI Music Copyright Laws 2025" and "how creators use AI music," which frame Mureka as a compliant solution for avoiding copyright strikes while issuing "full commercial licensing rights for every track generated."

83.    Mureka further tells users that tracks generated on paid plans are accompanied by ownership certificates and metadata logs documenting "authorship and licensing status," and that users "generally retain ownership" of their AI-generated music. At the same time, Mureka's Terms of Service and app-store commentary reveal that Defendants reserve broad, royalty-free rights

to exploit users' outputs and may require users to grant exclusive distribution
rights to Mureka for certain services.

84.     In practice, these representations reassure users that they can rely
on Mureka as a substitute for licensing existing music, while obscuring the fact
that Mureka's "original" tracks are produced by models trained on massive,
undisclosed libraries of copyrighted recordings—including, on information and
belief, the Copyrighted Recordings owned or controlled by Plaintiffs.

85.     Plaintiffs and similarly situated artists thus face a two-fold harm,
both at the input and output stages: Defendants (a) copy their recordings
without permission to build and refine Mureka's models, and (b) deploy those
models to sell AI-generated tracks that compete directly with Plaintiffs' works
in the very markets—sync, library, streaming, production, and commissioned
music—where independent artists earn their living.

*Mureka's Training Pipeline and Unlicensed Use of Plaintiffs' Works*

86.     Mureka is marketed as a full-stack AI music creation platform that
automates tasks ordinarily performed by human composers, producers, and
vocalists. Defendants describe Mureka as "the ultimate destination for
AI-powered music innovation," offering "advanced" music-generation models,
lifelike AI vocals, and "professional radio-quality tracks" for films, games, and
social content. Mureka's marketing promises users "100% royalty-free" music
"cleared for commercial use," so that creators "never have to worry about
copyright again" and can "say goodbye to copyright headaches" when they use
Mureka-generated tracks instead of licensed music.

41

87.     Unlike a human musician who might selectively listen to recordings over a lifetime for inspiration, Defendants' systems systematically copy and analyze vast numbers of full-length sound recordings and compositions at machine scale. This process is not anything like human "listening." It involves mass ingestion of entire works, feature extraction, and parameter fitting across complete recordings. After encoding statistical patterns and expressive features from those recordings into model parameters and embeddings, Defendants' systems synthesize new tracks by sampling from that encoding. Mureka's outputs remain conditioned on, and constrained by, the training corpus.

88.     On information and belief, Defendants copied and used a very large number of copyrighted sound recordings and compositions, including recordings owned or controlled by Plaintiffs and the Class, to build and refine the Mureka models without obtaining licenses or other permission from the vast majority of rightsholders. Independent artists' recordings are especially vulnerable because they are widely available on streaming platforms and video sites, yet lack the bargaining power of major labels. Defendants' claims that Mureka can generate "studio-quality," "radio-quality," "royalty-free," commercially usable tracks in specific genres, moods, and vocal styles would not be technically feasible without directly copying, analyzing, and incorporating expressive elements from such protected works into their training corpora.

89.    This allegation is not speculative. Kunlun, the parent technology group behind Mureka, has publicly released a research paper titled *Analyzable Chain-of-Musical-Thought Prompting for High-Fidelity Music Generation* ("MusiCoT"), authored by Kunlun employees and explicitly affiliated with Kunlun.[3] The paper describes a production-scale music generation framework that uses a large language model, CLAP-based ("Contrastive Language-Audio Pretraining") "musical thought" embeddings, and diffusion models to generate high-fidelity music, with and without vocals, including structure-aware, style-referenced compositions. MusiCoT is a commercial implementation and benchmark target for the same family of models developed by Kunlun's research team. On information and belief, Mureka's commercial models are built on, derived from, or substantially similar to the MusiCoT architecture and training pipeline.

90.    In that paper, Kunlun's researchers state that the models, "including [the] SSL, CLAP, RVQ, semantic LM, audio VAE-GAN, and diffusion model", are trained "on approximately 10 million English songs sourced from DISCO-10M and around 200,000 confidential in-house music tracks." For data preparation, they explain that they: (a) use the Demucs music-source-separation model to extract vocals from the songs; (b) run an automatic speech recognition (ASR) model to transcribe the extracted vocals and produce time-aligned lyric text; (c) apply voice-activity detection to identify silence; and (d) use an "All-in-One" structure-analysis model to segment tracks

---

[3] https://arxiv.org/html/2503.19611v1

into intro, verse, chorus, break, outro, and other sections. They further describe analyzing CLAP audio embeddings for each 10-second segment to study instrumentation and arrangement over time.

91.     The DISCO-10 M dataset on which Kunlun's models are trained is itself built around links to YouTube-hosted videos. Its authors explain that DISCO-10M is constructed by matching millions of Spotify track identifiers to YouTube videos, and that the dataset represents approximately 10 million songs and over 1,062,000 hours (about 121 years) of YouTube audio. Public technical discussion of DISCO-10M notes that the dataset was later removed from distribution because the creators "legally can't continue distributing it," reflecting acknowledged copyright concerns around the underlying music. On information and belief, Kunlun obtained and processed full-length audio for millions of these YouTube-sourced songs in order to run Demucs, ASR, CLAP, and segmentation models as described in the MusiCoT paper.

92.     Separately from DISCO-10M, Kunlun's paper references approximately 200,000 "confidential in-house music tracks" used for training and fine-tuning. The paper does not identify these tracks, disclose any licensing arrangements, or explain how Kunlun obtained them. On information and belief, these "in-house" tracks consist largely of commercially released, copyrighted recordings aggregated from digital service providers, video platforms, and other online music libraries without licenses from Plaintiffs and other rightsholders.

93.     On information and belief, Defendants (and/or their agents) bypassed encryption, paywalls, API access controls, or streaming DRM to acquire source audio and lyric text, in violation of 17 U.S.C. § 1201(a)(1); and used, offered, or procured tools primarily designed for such circumvention in violation of § 1201(a)(2) and/or § 1201(b)(1).

94.     On information and belief, and by way of example, Defendants obtained many of the copyrighted sound recordings in their training set by illicitly downloading them from YouTube using "stream-ripping," a well-known method of music piracy.

95.     YouTube is designed for streaming, not copying. It allows users to play content as it is retrieved, but prohibits making permanent, unrestricted downloads. Plaintiffs upload certain copyrighted recordings to their official YouTube channels and conspicuously identify their protected status, including the label, copyright owner, etc.

96.     Like other streaming services, YouTube bars unauthorized copying and employs technical protections to stop it. For example, YouTube uses an evolving "rolling-cipher" system that controls access to the underlying media files and prevents direct downloads of licensed content. *See Green v. U.S. Dep't of Justice*, 111 F.4th 81, 89 (D.C. Cir. 2024) (noting streaming services encrypt media to prevent unauthorized copying).

97.     YouTube applies the rolling-cipher process with the authority of Plaintiffs as copyright owners to govern access to each sound recording Plaintiffs upload. While the rolling cipher incidentally hinders downstream

copying, its primary function is to control the initial, authorized access path by which clients retrieve and assemble the expressive content. The same access-gating process applies whether the user watches in real time or any client seeks to fetch the data wholesale. Access to the recording's audiovisual data requires application of that process. Requests lacking a valid, cipher-derived signature are denied; authorized playback succeeds only when the owner-approved process is executed. In practical operation, the rolling cipher controls access to the work by gating the retrieval and assembly of the audiovisual data that embodies the sound recording itself, not merely the creation of a permanent copy. The player's ability to present the recording to the user depends on successful execution of this owner-authorized process.

98.     Plaintiffs authorize YouTube to apply the rolling cipher and related time modulation protocols (TPMs) to their uploads, and to condition client access on execution of that process.

99.     Despite these protections, third-party tools exist that circumvent YouTube's rolling cipher and generate unrestricted copies of copyrighted files. This practice, commonly called "stream-ripping", has been held unlawful. *See UMG Recordings, Inc. v. Kurbanov*, 2021 WL 6492907, at 9 (E.D. Va. Dec. 16, 2021), report and recommendation adopted, 2022 WL 20417526 (E.D. Va. Feb. 10, 2022).

100.    On information and belief, Defendants' acquisition of Plaintiffs' Copyrighted Recordings for training was accomplished, among other ways, by

46

unlawfully bypassing YouTube's rolling cipher and other technological measures that restrict downloading and copying of licensed content.

101.   Unknown Defendants provided a service or technology to Defendants primarily designed to circumvent YouTube's rolling cipher, which effectively protects Plaintiffs' rights under §106 by preventing unauthorized reproduction, in violation of § 1201(b)(1)(A); and/or effectively controls access to the work, in violation of §1201(a)(2).

102.   By circumventing those technological measures, Defendants violated the Copyright Act's anti-circumvention provisions: "No person shall circumvent a technological measure that effectively controls access to a work protected under this title." 17 U.S.C. § 1201(a)(1)(A).

103.   Defendants' stream-ripping and copying were unauthorized, unlawful, and integral to the creation of its models. Those violations are not excused by any later product changes or technical guardrails.

104.   Defendants did not stop at stream-ripping and copying. On information and belief, Defendants maintain centralized, persistent corpora of audio and lyric files, separate from transient training shards, that engineers can and do access to make additional copies for evaluation, ablation testing, alignment, red-teaming, and fine-tuning iterations. These corpora include works Defendants scraped without authorization.

105.   Defendants' retained corpora are used for non-training engineering workflows (e.g., test harnesses, regression suites, prompt-response evaluation, retrieval-augmented generation experiments, voice timbre matching, and

guide-track alignment). Each such use reproduces and redistributes copies internally and sometimes to vendors/partners, independent of any "training" defense.

106. On information and belief, Defendants' staff and contractors had search and browse access to these corpora, and Defendants lack a copy accounting or deletion protocol, resulting in unbounded downstream copying.

107. Where Defendants initially acquired recordings/lyrics from pirated/shadow-library sources or streams defeated by circumvention, those copies were retained and repurposed even when alternative sources later became available. Retention and repurposing of such pirated copies is not excused by any claim of "training" fair use.

108. Each retention, internal replication, and reuse counts as a separate act of reproduction and, when CMI was removed, a new DMCA §1202(b) violation.

109. On information and belief, Defendants distributed copies of Plaintiffs' works (or substantial portions) by sharing corpora or sub-sets with service providers and/or partners (including for integration, benchmarking, or fine-tuning support). Specific channels and modes of third-party dissemination, including partner integrations, third-party cloud compute/storage, contractors and collaborators, multi-entity data pipelines, and off-site/disaster-recovery replication, are detailed in Count II, ¶182(a)–(e), and related allegations at ¶¶181–186.

110. Mureka's product descriptions are consistent with this Kunlun-disclosed training pipeline and confirm that the commercial service is designed to exploit large corpora of real recordings. Defendants advertise features such as: (a) "AI Style-Matching Generation" that allows users to "upload a favorite track and [have] Mureka AI instantly generate a new piece that mirrors its style and vibe"; (b) "Generate Similar Songs," where uploading a "reference track" causes Mureka to "quickly create a song in a similar style, closely matching your desired vibe"; and (c) AI vocals that let users "clone any voice" by specifying gender, texture, and character. These features require the underlying models to encode, condition on, and reproduce detailed stylistic and vocal patterns from training recordings and from user-supplied references.

111. On information and belief, Defendants' training of Mureka involves a deliberate, multi-step pipeline designed to ingest large numbers of recordings and lyrics, convert them into anonymized training units, and strip away or disassociate CMI that identifies works and their owners. The pipeline includes at least the following stages: (a) acquisition; (b) conversion to raw audio formats and tokenized representations; (c) standardization of audio parameters; (d) segmentation into short, de-contextualized clips; and (e) parallel processing of lyric and vocal text.

112. *Acquisition.* On information and belief, Defendants (and/or their agents) systematically copied very large numbers of commercially released sound recordings and associated lyric texts from multiple sources—including, but not limited to, the DISCO-10M/YouTube corpus, other YouTube- or

Spotify-linked datasets, streaming platforms, video-hosting services, digital music storefronts, and lyric sites—to create corpora used to pre-train and fine-tune Mureka's models. Defendants have not disclosed a transparent licensing or artist-compensation framework for these training datasets. Both Mureka's own marketing and public materials describing Mureka and Kunlun's MusiCoT research emphasize training on "approximately 10 million English songs" and "vast" corpora of musical compositions, but do not identify any licenses or opt-out mechanisms for rights holders.

113. *File conversion and metadata removal.* On information and belief, Defendants convert downloaded or streamed audio, typically delivered in consumer streaming formats, into raw waveform representations and/or learned token sequences, such as residual vector-quantized (RVQ) audio tokens and CLAP audio embeddings. The MusiCoT paper explains that Kunlun's models operate on semantic tokens produced by SSL encoders (e.g., BEST-RQ) and on CLAP embeddings for each 10-second audio segment. Converting recordings into such raw or tokenized formats strips away standard file metadata, including ID3 tags, track titles, album names, artist and performer names, producer credits, label information, embedded artwork, licensing notices, and many other forms of CMI. As a result, the files and token streams used in Mureka's training pipeline become anonymized at the file level, severing the link between the audio content and the human creators and rightsholders.

114. *Format standardization.* After conversion, Defendants further process these recordings by standardizing sample rates, bit depths, channels, and loudness levels, and by re-encoding them into uniform internal formats suitable for efficient large-scale training (e.g., audio latents at 44.1 kHz, CLAP embeddings, and RVQ codebooks). These steps permanently eliminate any residual metadata, file headers, or container-level identifiers that might have survived initial conversion. At the same time, they preserve the underlying expressive content—melodies, harmonies, rhythms, arrangements, and vocal performances—so that the infringement remains fully intact even as attribution is erased.

115. *Disassociation via structural segmentation and 10-second snippets.* On information and belief, Defendants then segment the standardized audio into shorter, partially overlapping clips aligned with musical structure. Kunlun's MusiCoT paper describes using the All-in-One structure-analysis model to break songs into sections such as intro, verse, chorus, and outro, and then analyzing each 10-second segment's CLAP embeddings to study instrumentation and arrangement. This segmentation step deliberately breaks longer recordings into small, context-free snippets, which are then shuffled across training batches and epochs. Segmenting tracks in this way removes remaining contextual cues (such as track-level sequencing and album context) that would otherwise allow engineers or downstream systems to easily trace snippets back to particular songs or artists. The resulting anonymized

segments retain the expressive content of Plaintiffs' performances but are disassociated from their original creators and CMI.

116. *Lyric and vocal-text acquisition and processing.* On information and belief, Defendants run a parallel pipeline for lyrics and vocal content. Kunlun's paper states that an ASR model is applied to the extracted vocals from each song to obtain transcribed lyrics and precise timestamps for each line, which are then used for alignment and conditioning. Creating these transcriptions generates new textual copies of the lyrical works. The pipeline then tokenizes the lyric text (e.g., using subword tokenization such as BERT-style tokenization) and combines these tokens with CLAP audio embeddings and other metadata in a semantic language model. On information and belief, Defendants likewise ingest lyric files and lyric-rich web corpora from online lyric databases and music platforms, convert each file to raw text, strip header metadata (song titles, writer and publisher credits, copyright notices), and tokenize the text for training. Each of these steps created intermediate copies of lyrical works and removed textual CMI used in the music industry to track ownership and licensing.

117. *Fine-tuning on curated datasets.* On information and belief, after large-scale pre-training on tens of millions of songs, Defendants further fine-tune successive Mureka versions (including Mureka O1, O2, V5-series, V6, V7, V7.5, and V7.6 models) on smaller, curated subsets of audio and lyric-heavy data to improve rhyme schemes, syllabic cadence, phrasing, melodic contour, genre-specific instrumentation, and semantic-to-melody

alignment. These fine-tuning passes are targeted at high-value genres, languages, and catalogs, and require repeated reproduction and processing of copyrighted recordings and lyrics beyond any transient technical need.

118.  *Intentional loss of provenance.* Defendants' pipeline is designed so that original metadata—including CMI in audio file headers, embedded watermarks, and textual attribution—is not preserved, restored, or maintained once recordings and lyrics enter the training system. The combination of conversion, standardization, structural segmentation, and tokenization ensures that training copies and internal representations are detached from the original CMI that would otherwise identify authorship, ownership, and licensing status, obscuring the provenance of Plaintiffs' works and frustrating attribution and licensing.

119.  Once Defendants have fully anonymized and segmented the recordings and lyrics, they feed these de-contextualized snippets and token sequences into Mureka's generative models and commence training. Kunlun's MusiCoT framework uses CLAP embeddings to build a "chain of musical thoughts" for each piece, planning structure at the level of musical sections before generating audio tokens. The models learn to predict and reconstruct audio and lyric patterns from these inputs; the underlying expressive content of Plaintiffs' works is thereby encoded into the models' weights, embeddings, and internal representations even though explicit identifiers have been removed.

120.    Generative models of the sort Defendants operate exhibit an AI phenomenon known as "memorization" or "overfitting" when exposed repeatedly to the same training examples. In that regime, the model does not merely learn general stylistic patterns; it stores detailed fragments of its training data and can reproduce them when prompted appropriately. For music models, overfitting enables reproduction of distinctive melodic lines, chord progressions, grooves, vocal inflections, and production textures from specific recordings rather than merely generating music "in the style of" a genre in the abstract. This risk is heightened where, as here, the system is expressly designed to accept variable-length audio "style references" and to match or "mirror" uploaded tracks.

121.    Defendants train and deploy Mureka with the purpose and expectation that the system will emit audio and lyrics resembling recognizable works, genres, and artist styles, without source attribution. Defendants further refine their models by selectively fine-tuning on smaller, high-impact datasets to enhance Mureka's ability to accurately reproduce particular musical styles, production signatures, and vocal characteristics, deepening the link between model behavior and specific source works.

122.    Defendants' claims that Mureka can generate "human-sounding," "studio-grade," "radio-quality," and "royalty-free" music critically depend on this copying and exploitation of real human-created recordings and lyrics. If Defendants had limited themselves to public-domain or properly licensed corpora, the resulting models would be markedly less competitive, less

convincing, and less substitutive in the commercial markets where Mureka is intended to operate.

123.    Defendants' infringement is complete at the moment they reproduce Plaintiffs' works in their corpora and training pipelines. An AI model cannot consistently replicate distinctive elements—signature riffs, unique vocal stylings, characteristic chord-progression-plus-groove combinations, or producer-level arrangement choices—unless those elements were first copied and memorized during training.

*Industry Evidence of Unlicensed Scraping and Circumvention*

124.    Mureka's conduct occurs against a broader backdrop in which major music-industry bodies have uncovered systemic unlicensed scraping by AI companies. In 2025, the International Confederation of Music Publishers ("ICMP") publicly announced that it had compiled "hundreds of pages" of evidence showing that large technology and AI firms used unlicensed copying of music to train AI systems. ICMP's Director General described this as "the largest IP theft in human history," emphasizing that "tens of millions of works [are] being infringed daily," often via direct use of individual YouTube, Spotify, and GitHub URLs collated "in direct breach of the rights of music publishers and their songwriter partners."[4]

---

[4] R. Smirke, "The Largest IP Theft in Human History: Breaking Down the Years-Long Investigation Into How AI Firms Are Stealing Music" Billboard, https://www.billboard.com/pro/ai-firms-steal-music-scrape-copyright-icmp-investigation/

125.    Media reporting on ICMP's dossier emphasizes that the evidence includes private datasets documenting illegal scraping and "stream-ripping" from YouTube by AI music applications Suno and Udio, as well as large-scale scraping of lyrics and compositions by big-tech AI projects. Separate lawsuits filed by major record labels and independent musicians against Suno and Udio allege that those companies used code to bypass YouTube's "rolling cipher" encryption in order to download licensed tracks in bulk for training, in violation of both YouTube's terms of service and the anti-circumvention provisions of the Digital Millennium Copyright Act (DMCA).

126.    The DISCO-10M methodology explicitly relies on YouTube video identifiers linked to Spotify tracks, and successor datasets such as LAION-DISCO-12M similarly provide millions of links to music on YouTube and YouTube Music for use in audio-AI research. When, as Kunlun's MusiCoT paper describes, a model developer uses such datasets to train source-separation models, CLAP, semantic LMs, and diffusion models, they must obtain and process the underlying music audio streams—not just metadata or precomputed embeddings—at massive scale. On information and belief, Defendants (and/or their vendors) did so here for Mureka's training corpora.

127.    Plaintiffs do not yet have discovery into the exact tools Defendants used to acquire training audio from YouTube, YouTube Music, or other streaming services, nor do Plaintiffs have access to Defendants' internal copies of datasets such as DISCO-10M. However, the combination of (a) Kunlun's

documented use of DISCO-10M and 10-million-song YouTube-based corpora, (b) industry-wide evidence that many AI music companies relied on stream-ripping and other DRM-bypassing techniques to download YouTube audio for training, and (c) Defendants' refusal to disclose their training set, strongly supports the inference that a significant portion of Mureka's training audio was acquired by circumventing technical measures that control access to copyrighted works.

128.   To the extent Defendants (and/or their agents) bypassed encryption, paywalls, API access controls, or streaming DRM to acquire source audio and lyric text from services such as YouTube, such conduct would violate 17 U.S.C. § 1201(a)(1); and the use, offering, or procurement of tools primarily designed for such circumvention would violate § 1201(a)(2) and/or § 1201(b)(1). Streaming platforms like YouTube are designed for playback, not bulk copying, and employ technical measures—including an evolving "rolling-cipher" system—to control access to the underlying media files and prevent direct downloads of licensed content. Courts have recognized such measures as effective technological protection measures (TPMs) under the DMCA. See *Green v. U.S. Dep't of Justice*, 111 F.4th 81, 89 (D.C. Cir. 2024); *UMG Recordings, Inc. v. Kurbanov*, 2021 WL 6492907, at *9 (E.D. Va. Dec. 16, 2021), report and recommendation adopted, 2022 WL 20417526 (E.D. Va. Feb. 10, 2022).

*Removal and Alteration of Copyright Management Information (CMI)*

129.   On information and belief, Defendants' training of Mureka involves a deliberate, multi-step process that removes or alters copyright management information embedded in original recordings and lyric files. This process includes acquisition, conversion to raw formats and tokens, standardization of audio parameters, structural segmentation into anonymous snippets, and textual tokenization. At each stage, identifiers that convey authorship, ownership, and licensing status are stripped away or rendered unusable.

130.   At the acquisition stage, Defendants obtain recordings and lyric content from sources where CMI is present or readily accessible—such as album and track credits, label information, ISRC codes, lyric-site headers, and platform-supplied attributions. When Defendants convert the downloaded audio files into raw waveforms, spectrograms, CLAP embeddings, and RVQ audio tokens, that process automatically removes critical metadata, including ID3 tags, artist names, song titles, producer credits, album information, embedded artwork, licensing information, and copyright notices. The MusiCoT framework explicitly operates on such metadata-free tokens and embeddings.

131.   After conversion, Defendants standardize audio parameters (sample rate, bit depth, channels, loudness) and re-encode the recordings into uniform latents and token sequences to facilitate training and sampling. While these steps permanently eliminate any remaining metadata and identifiers, the underlying creative content—melodies, harmonies, rhythms, timbres, and vocal performances—remains fully intact.

132.    Defendants' structural segmentation process further disassociates the music from track-level CMI. By slicing songs into short, overlapping segments aligned to intro, verse, chorus, and other sections, and then encoding each 10-second segment as CLAP embeddings and RVQ tokens, Defendants create training inputs that retain Plaintiffs' expression but cannot be trivially re-linked to the original track or its CMI.

133.    For lyrics and vocal text, Defendants' ASR and text-processing pipeline likewise strips CMI. ASR produces raw textual transcriptions of vocals without preserving the original credits or copyright notices. Defendants then tokenize and store these texts for training, separate from any songwriter, publisher, or label metadata that accompanied the recordings on streaming or lyric platforms. On information and belief, Defendants also ingest full-text lyric files scraped from lyric sites; their pipeline converts these to plain text and removes headings identifying the song, author, publisher, and copyright owner.

134.    Defendants' process is designed to ensure that CMI is stripped at ingestion and kept stripped throughout training and deployment. The training architecture is built so that original metadata, including CMI, is never preserved, restored, or otherwise maintained once recordings and lyrics enter the model-training system. This systematic removal or alteration of CMI violates 17 U.S.C. § 1202(b), as the discarded metadata explicitly informs the public, and the creators themselves, of authorship, ownership, and licensing status.

135. Once Defendants have fully anonymized and segmented the recordings and lyrics, they feed these snippets and token sequences into Mureka's generative models, initiating the training phase. Defendants train Mureka with the purpose and expectation that the system will emit audio and lyrics resembling recognizable works or artists without source attribution—a result enabled and concealed by their prior CMI removal.

136. Defendants further refine their models by selectively fine-tuning them on smaller, curated subsets of music data, enhancing their ability to accurately reproduce specific musical styles, characteristics, and artist signatures. On information and belief, this fine-tuning includes targeted training on genres, eras, and vocal types closely matching Plaintiffs' catalogs and performances.

137. Defendants distribute these CMI-stripped outputs to paying users as "royalty-free," "copyright-safe" tracks, knowing they will be uploaded and exploited on third-party platforms without proper attribution, further concealing infringement. These outputs trade on the commercial value of the original artists' identities, including their distinctive voices and production styles, creating the false impression of affiliation or endorsement and appropriating persona value without consent.

138. Defendants' systematic ingestion of tens of millions of copyrighted recordings, ranging from prominent hits to independent tracks, without preserving or respecting associated CMI, constitutes numerous separate violations of § 1202(b). Given the scale of this misconduct, the resulting

statutory damages are potentially enormous, reflecting the gravity of

Defendants' infringement and deliberate disregard for copyright law.

*Outputs Are Not Required for Liability;*
*Mureka's Model Purpose and Scale Create Market Harm Even Absent*
*Plaintiff-Specific Matches*

139.   Defendants' infringement completes at reproduction, when they

copy Plaintiffs' works into their corpora, intermediate tokens, and training

pipelines. An AI model cannot consistently replicate distinctive elements—such

as specific riffs, unique vocal stylings, or signature instrumental textures—

unless those recordings were first included and memorized during training.

140.   Recent investigations underscore that AI-music systems trained in

this way are designed to serve as high-volume substitutes for licensed music,

not as neutral research tools. ICMP's director general has explained that within

any one model's training dataset 'you're often talking about tens of millions of

musical works' assembled from commercial platforms such as YouTube and

Spotify, a scale that necessarily impacts existing licensing markets.[5]

141.   Defendants' unauthorized copying causes cognizable market

substitution and dilution in multiple, well-defined music markets, even where

any given AI output is not a near-verbatim copy, because Mureka is purposely

designed and marketed to supply close substitutes at scale and to replace

licensed music acquisition and production. The relevant markets include,

without limitation: (a) streaming and download consumption; (b) micro-sync

and production-music licensing; (c) composing and session-work commissions;

---

[5]  Id.

(d) lyric and composition licensing; (e) sampling, stems, and beat-lease markets; and (f) international advertising, gaming, and short-video markets.

142. Defendants' user scale, pricing tiers, high output quotas, and enterprise API offerings make substitution foreseeable and substantial. Mureka's business model is explicitly predicated on enabling creators, businesses, and developers to generate "studio-quality," "royalty-free" soundtracks and vocals on demand, replacing the need to license human-created music. Mureka is promoted for exactly the contexts in which Plaintiffs' music would otherwise be used: as background and featured tracks in videos, podcasts, streams, ads, and games, and as substitutes for human composers, producers, and vocalists.

*Mureka Cannot Claim Fair Use for Its Systemic Infringement*

143. In response to allegations of unauthorized copying, Defendants are expected to argue—like other generative AI companies—that their use of copyrighted sound recordings and lyrics for training constitutes "fair use." Any such defense implicitly acknowledges that Defendants engaged in unlicensed copying, as fair-use analysis only arises once unauthorized use has occurred.

144. Fair use does not apply to Defendants' training or model operations. Defendants' copying is not for indexing, search, accessibility, or criticism. It serves the same commercial purpose as Plaintiffs' works: creating, licensing, and monetizing recorded music, vocals, and compositions. Defendants' use does not comment on or critique Plaintiffs' works; it aims to

replace them with machine-generated substitutes in the very markets Plaintiffs rely on.

145. Mechanisms of dilution and substitution (non-exhaustive examples):

a. *Scale-driven supply shock.* Defendants' models and pricing tiers, including high daily output limits and 'studio' or 'radio-quality' outputs, enable industrial-scale flooding of distribution channels with AI tracks that crowd out human work in feeds, playlists, and catalog searches.

b. *Algorithmic displacement.* Recommendation, search, and playlisting systems prefer abundant, instantly-generated "good-enough" tracks, causing discoverability loss and rank demotion for Plaintiffs' works.

c. *Price suppression/anchoring.* Bundled or low-cost AI outputs reset buyer expectations, driving down sync quotes, library rates, and work-for-hire budgets; buyers substitute cheaper AI rather than licensing Plaintiffs' recordings/compositions.

d. *"Style-of" and voice-replication substitution.* Defendants' models and tools replicate signature sonic identities and voices, enabling sound-alike uses that replace the need to license Plaintiffs' actual works or to hire Plaintiffs for new commissions.

e. *Derivative-market cannibalization.* Creators use Mureka-generated outputs instead of licensing samples/stems or beats from Plaintiffs, eroding revenues in those derivative markets.

f. *Platform-integration diversion.* Integration into mass-market tools (e.g., assistants, creative suites, creator platforms) diverts project pipelines that previously sourced licensed music toward instantaneous AI generation, foreclosing licensing opportunities mid-workflow.

g. *Attention scarcity and catalog devaluation.* Saturation of AI tracks in the same genres/time-slots dilutes attention, lowers stream share, and devalues Plaintiffs' catalogs (including reduced royalty flows and valuation metrics).

h. *Attribution stripping and source confusion.* Removal/obfuscation of CMI and replication of audible tags (e.g., producer shouts) divert credit and reroute demand to AI substitutes by disguising provenance, aggravating displacement.

146. The Copyright Act, 17 U.S.C. § 107, outlines four factors courts use to evaluate fair use. All four factors weigh against Defendants.

a. *Purpose and character of the use.* Defendants' use is quintessentially commercial. They copy Plaintiffs' creative works wholesale to develop and market subscription-based and enterprise AI-music products, profiting directly through fees and commercial licensing. Even if Defendants argue that training is "transformative," a model designed to create works that compete with and displace originals is at best weakly transformative, and in such circumstances the fourth factor (market harm) predominates.

b. *Nature of the copyrighted work.* Plaintiffs' copyrighted recordings, compositions, and lyrics are highly creative, expressive works that

lie at the core of copyright protection. This factor weighs strongly in Plaintiffs'
favor.

      c.   *Amount and substantiality of the portion used.* Defendants do
not use Plaintiffs' works selectively or sparingly. They systematically ingest
complete sound recordings and full lyric texts, capturing their creative essence,
to train Mureka's models. Such extensive and systematic copying clearly favors
Plaintiffs and strongly weighs against fair use.

      d.   *Effect on the market.* Defendants' unlicensed copying causes
cognizable market substitution and dilution across multiple music markets,
even where individual AI outputs are not literal copies, because Mureka is
deliberately designed and marketed to replace licensed music acquisition and
production. The relevant markets include, without limitation:

      i.   *Sound-recording consumption & monetization.* Streaming and
download markets for Plaintiffs' recordings (and long-tail catalog) are
diminished as user-creators and platforms substitute Defendants' -generated
tracks for licensed masters. Mechanisms: (A) playlist and background-music
displacement; (B) "share-of-ear" substitution on UGC/social platforms; (C)
algorithmic recommendation cannibalization when Mureka's tracks are
uploaded to DSPs.

      ii.   *Indie/long-tail licensing channels.* Bandcamp/Direct-to-fan
sales, YouTube Content ID monetization, and micro-sync catalogs lose demand
as Defendants' model generates cheap substitutes targeted by
genre/mood/tempo.

iii. *Composition/publishing revenue.* Mechanical, performance, and sync royalties are diluted when Defendants' -generated tracks substitute for licensed usages of Plaintiffs' songs in comparable contexts (creator content, television and film scores, small-business background audio, ads), reducing PRO distributions[6] and publisher receipts.

iv. *Commissioned works and session labor.* Commissions for custom cues, jingles, beds, and hooks are displaced by Defendants' prompts and in-app refinements, diminishing Plaintiffs' downstream income streams associated with their recordings and compositions.

v. *Lyrics-dependent markets.* Defendants' ingestion and lyric-generation capabilities substitute for and dilute markets for lyric reproduction and display (e.g., lyric videos, karaoke, educational uses) and for lyric-driven synchronization, while also reducing demand for licensed derivative uses (e.g., translations, lyric excerpts in audiovisual works).

vi. *Sampling/remix/derivative markets.* Defendants' outputs, engineered from Plaintiffs' copyrighted sound recordings and compositions, are used as replacements for licensed samples, stems, remixes, and "beat leases," diverting demand from Plaintiffs' authorized derivative-use markets.

vii. *Live/performance-adjacent and fan-engagement markets.* AI tracks and AI-rendered performances cannibalize demand for authorized live

---

[6] PRO refers to Performing Rights Organizations, which collect and distribute royalties from public performances of music, to songwriters and publishers.

recordings, session work, bespoke "fan song" commissions, and other ancillary monetization tied to Plaintiffs' recordings and personas.

        viii.    *International sub-markets.* Low-budget global advertising, mobile gaming, and short-video platforms disproportionately substitute AI tracks for licensed independent music, compounding dilution for long-tail rights holders.

147.  Defendants' scale (10+ million users), product design, and marketing make these market effects neither speculative nor incidental. Mureka's outputs are intended to be used exactly where Plaintiffs' music would otherwise appear: as background and featured tracks across digital platforms and as replacements for human labor in composition, production, and vocal performance.

148.  Defendants' choice to train on unlicensed copyrighted recordings and lyrics—rather than on public-domain works or properly licensed corpora—materially improves model quality and human-likeness, thereby increasing substitutability and magnifying market harm. If Defendants had trained only on non-infringing data, Mureka's outputs would be less compelling and less likely to displace Plaintiffs' sales, streams, and licenses.

149.  On information and belief, and subject to proof with transactional, platform, and expert data, Plaintiffs will show: (a) lost or discounted sync and micro-sync deals where buyers selected Mureka outputs or other AI-generated tracks instead of licensing Plaintiffs' works; (b) declines in stream share and playlist placements correlated with the rollout of Mureka's higher-quality

models and creator-tool integrations; (c) reduced licensing volumes and rates in production-music, beat-lease, and small-business background-music markets following Mureka's scale-up; and (d) lost commissions for composition, production, and session vocals where Mureka outputs were used in place of hiring human creators. These forms of substitution, including indirect substitution via market dilution at scale, are exactly the kinds of harms that 17 U.S.C. § 107(4) recognizes.

150.   Given these facts, each fair-use factor decisively weighs against Defendants, and the fourth factor, market harm, is alone dispositive. Defendants' same-market design and scale dilute demand and pricing for Plaintiffs' works and licensing opportunities. Even if training carries some arguable transformative weight, factor four controls, and fair use fails.

151.   Defendants' actions cause damage far beyond immediate economic harm to individual Plaintiffs. Their systematic copying and exploitation of copyrighted recordings, lyrics, and identity-linked vocal performances threaten the integrity and sustainability of the entire music ecosystem, including the livelihoods of musicians, songwriters, producers, engineers, and other professionals who depend on a functioning licensing market.

152.   Defendants' conduct directly undermines artists' fundamental right to control the use and presentation of their creative work, depriving them of the ability to decide how their music and voices are used, combined, and associated with brands, products, or messages. By ignoring the need for permission or compensation and promising users "royalty-free" substitutes

68

instead, Defendants promote the dangerous misconception that copyrighted music is free to exploit whenever technological innovation makes licensing inconvenient.

153.  Sustainable coexistence between AI and human creators is possible, but it requires that AI developers respect established market mechanisms for licensing music and compensate the artists whose work makes high-quality AI possible. Unlike AI innovators who engage in good-faith licensing negotiations and build models on authorized catalogs, Defendants chose to build Mureka on undisclosed, anonymized copies of Plaintiffs' and Class members' works, jeopardizing both creative integrity and market stability.

154.  From the inception of Mureka, Defendants have deliberately disregarded the established rights of copyright holders as part of an aggressive strategy to dominate the AI music generation market. Allowing Defendants or any generative AI company to succeed through deliberate infringement of copyright law threatens individual artists and the foundational legal and ethical principles that incentivize artistic creation and cultural advancement.

155.  Without judicial intervention, Defendants will continue to expand Mureka's models, ingest more recordings and lyrics, and flood the market with derivative, uncredited tracks that trade on Plaintiffs' creativity and identities. Plaintiffs therefore seek damages, injunctive relief, and all other remedies necessary to halt Defendants' unlawful acts and to restore the rightful benefits of copyright protection to those who actually create the music.

69

## CLASS ACTION ALLEGATIONS

156.   Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23 on behalf of themselves and all other similarly situated independent artists ("Class Members"). The term "independent artists," as used herein, broadly includes all individuals, entities, or rights holders—whether artists, musicians, songwriters, producers, estates, heirs, independent labels, or other persons—who create, perform, produce, or own exclusive rights in (a) sound recordings, and/or (b) the lyrics or other textual elements of musical compositions. Plaintiffs seek certification of the following nationwide classes and subclasses:

a.   *Copyright Class*: All independent artists in the United States who own or exclusively control registered copyrights in sound recordings fixed on or after February 15, 1972, that appear in any dataset Defendants copied, ingested, or exploited for AI training during the Class Period, as alleged herein, excluding works Defendants used under a written license executed by Defendants during the Class Period.

b.   *Previously-Unregistered Copyright Class*: All independent artists in the United States who own or exclusively control copyrights in original sound recordings that were unregistered with the U.S. Copyright Office at the time Defendants copied, ingested, or exploited them for AI training during the Class Period, as alleged herein, excluding works Defendants used under a written license executed by Defendants during the Class Period.

c. *Lyrics Copyright Subclass*. All independent artists in the United States who own or control registered U.S. copyrights in the lyrics or textual portions of musical compositions that appear in any dataset Defendants copied, ingested, or used to train, fine-tune, or reinforce-learn its music-generation models during the Class Period.

d. *Previously-Unregistered-Lyrics Subclass*. All independent artists in the United States who own or control copyrights in the lyrics or textual portions of musical compositions that were unregistered with the U.S. Copyright Office at the time Defendants (or their agents) copied, ingested, or used them to train, fine-tune, or reinforce-learn its music-generation models during the Class Period, as alleged herein, excluding works Defendants used under a written license executed by Defendants during the Class Period.

e. *Musical-Composition (Non-Lyric) Registered Subclass*: All persons or entities who, during the Class Period, owned U.S. registered copyrights in the non-lyric musical-composition elements (melodic, harmonic, rhythmic expression and fixed arrangements) of works that appear in any dataset Defendants copied, ingested, or used to train, fine-tune, or reinforce-learn its music-generation models during the Class Period.

f. *Musical-Composition (Non-Lyric) Previously-Unregistered Subclass*: All persons or entities who, during the Class Period, owned musical compositions (non-lyric, including melodic, harmonic, rhythmic expression and fixed arrangements) that were unregistered with the U.S. Copyright Office at the time Defendants (or their agents) copied, ingested, or used them to train,

71

fine-tune, or reinforce-learn its music-generation models, as alleged herein, excluding works Defendants used under a written license executed by Defendants during the Class Period.

g. *DMCA Subclass*: All independent artists in the United States whose copyrighted sound recordings and/or musical-composition materials contained Copyright Management Information (CMI) at or before Defendants' acquisition, copying, conversion, segmentation, ingestion, training, fine-tuning, or evaluation, and that Defendants acquired, copied, converted, processed, or ingested during the Class Period; excluding works Defendants used pursuant to a written license executed by Defendants during the Class Period.

h. *§ 1201 Anti-Circumvention Subclass*: All independent artists in the United States who own or control copyrights in sound recordings and/or lyrics that, at the time Defendants or their agents acquired or accessed them, were made available through platforms, services, or delivery mechanisms employing technological measures that effectively control access to, or protect rights in, the works (e.g., YouTube's rolling cipher, HTTPS tokening/HLS AES-128 session keying, or DRM such as Widevine/PlayReady/FairPlay), and that Defendants or their agents acquired, accessed, copied, converted, processed, or ingested during the Class Period; excluding works Defendants used pursuant to a written license executed by Defendants during the Class Period.

i. *Illinois Biometric Information Privacy Act Subclass*: All independent artists residing in Illinois who created or performed sound recordings containing distinctive voiceprints or vocal identifiers, which Defendants

collected, captured, stored, or used without obtaining informed written consent as required under Illinois BIPA (740 ILCS § 14/1, et seq.). This subclass consists of natural persons.

j. *Illinois Right of Publicity Subclass*: All independent artists who are Illinois residents and/or whose identities (including name, voice, signature, photograph, image, or likeness) were used by Defendants for a "commercial purpose" in Illinois, without prior written consent, by: (i) reproducing, synthesizing, or simulating their distinctive voices or vocal signatures in Defendants'-generated outputs; and/or (ii) using their names, voices, or other identifying attributes to advertise, market, or promote Defendants' products or services. This subclass consists of natural persons.

k. *Illinois UDTPA Subclass (Injunctive Relief Only)*: All Illinois-resident members of any subclass seeking injunctive relief under 815 ILCS 510/3.

l. *Illinois Unjust Enrichment Subclass*: All Illinois-resident owners of relevant rights whose works, likenesses, or voiceprints appear in any dataset Defendants copied, ingested, or used to train, fine-tune, or reinforce-learn its music-generation models during the Class Period.

m. Excluded from these classes are Defendants, their affiliates, subsidiaries, officers, directors, employees, counsel, immediate family members of such persons, and the presiding judge and court personnel involved in this action.

n. As used above, 'Class Period' means the maximum time span permitted under the applicable statutes of limitations, accrual principles, and

73

tolling doctrines for the claims asserted—including, as applicable, the discovery rule, the separate-accrual doctrine for continuing infringements, continuing-violation concepts, fraudulent concealment, and equitable tolling— measured back from the filing of this action through the date of judgment (or class notice), without waiver of any longer period permitted by law.

o. For avoidance of doubt, nothing in any class or subclass definition limits, waives, or disclaims claims or remedies available under statutes other than the Copyright Act, including without limitation the DMCA, BIPA, IRPA, and UDTPA, and any reference to registration status, statutory damages, or attorneys' fees applies only to Copyright Act claims.

157. *Ascertainability*: Class members can be readily ascertained from public copyright registries, Defendants' records, digital identifiers, and other reliable public and private records. Additionally, widely available and reliable digital fingerprinting technologies, such as audio content identification systems, can efficiently identify class members' infringed recordings, making class administration manageable.

158. *Numerosity Rule 23(a)(1))*: The proposed classes consist of thousands of independent artists nationwide, including a significant number within Illinois, making the joinder of all members impracticable.

159. *Commonality (Rule 23(a)(2))*: Numerous questions of law and fact are common to all class members, and these common questions generate common answers resolving central issues for the entire class. These include, but are not limited to:

a. Whether Defendants systematically acquired, copied, ingested, and used class members' copyrighted sound recordings and/or lyrics in their training and model-operation pipelines;

b. Whether Defendants' copying, retention, and use of complete works during ingestion, training, and fine-tuning infringes the reproduction right under 17 U.S.C. § 106(1);

c. Whether Defendants' fair-use defense applies to the alleged training and model-operation conduct under 17 U.S.C. § 107;

d. Whether Defendants removed or altered Copyright Management Information (CMI) from class members' recordings and/or lyrics with the requisite knowledge or reason to know under 17 U.S.C. § 1202(b);

e. Whether Defendants collected, stored, and commercially exploited class members' biometric identifiers (voiceprints) without obtaining informed consent under Illinois BIPA.

f. Whether Defendants acted willfully, intentionally, or recklessly with respect to the challenged conduct;

g. Whether class-wide injunctive relief is appropriate to stop ongoing copying/ingestion, CMI removal/alteration, circumvention/trafficking, and unlawful use of biometric identifiers;

h. Whether Defendants' unauthorized ingestion and storage of entire works violates § 106(1) even absent evidence of public-facing outputs;

i. Whether Defendants' dissemination of datasets or copies to vendors, partners, or collaborators constitutes distribution "to the public"

under § 106(3) or, in the alternative, supports reproduction liability; and whether "making available" suffices to plead or prove distribution;

j.  Whether YouTube's rolling cipher, HTTPS tokening/HLS session keying, and DRM systems (e.g., Widevine/PlayReady/FairPlay) are "technological measures" that effectively control access to, or protect rights in, the works within the meaning of 17 U.S.C. § 1201, and whether any asserted fair-use defense applies to § 1201 claims;

k.  Whether Defendants provided or distributed false CMI in connection with outputs within the meaning of 17 U.S.C. § 1202(a) and with the requisite intent;

l.  Whether Defendants collected, captured, or obtained Illinois residents' voiceprints, without the required policy, notice, and consent BIPA requires; whether violations accrue per-scan; and the applicable limitations period.

m. Whether Defendants used Illinois residents' voices/identities for commercial purpose without consent within the meaning of IRPA, and whether IRPA claims are not preempted by the Copyright Act.

n. Whether Defendants' marketing/positioning is likely to cause confusion or misunderstanding as to source, sponsorship, approval, or affiliation under the Illinois UDTPA (injunctive relief).

o.  Whether Defendants qualify (or do not qualify) for DMCA § 512 safe-harbor protections for the conduct alleged;

160. *Typicality (Rule 23(a)(3))*: Plaintiffs' claims are typical of class members' claims. Plaintiffs and class members suffered identical harms from Defendants' unauthorized and systematic copying, ingestion, and commercial exploitation. All claims arise directly from Defendants' uniform, unlawful conduct.

161. *Adequacy of Representation (Rule 23(a)(4))*: Plaintiffs are independent artists whose interests are fully aligned with, and not antagonistic to, class members' interests. Plaintiffs retained experienced counsel skilled in complex copyright, DMCA, biometric privacy, and class action litigation. Plaintiffs and counsel will vigorously prosecute this action and adequately represent class interests.

162. *Predominance and Superiority (Rule 23(b)(3))*: Common questions predominate over individual questions. Class-wide adjudication is efficient, fair, economical, and superior to individual litigation, which would be impractical, economically prohibitive, and risk inconsistent rulings. Class-wide adjudication is particularly appropriate because Defendants' unauthorized copying and ingestion processes are automated, systematic, and identical across all class members, making individual factual inquiries unnecessary and impractical.

163. Statutory and other damages, although significant in aggregate, may individually be insufficient to justify costs associated with individual lawsuits, making class adjudication clearly superior.

164. *Injunctive Relief (Rule 23(b)(2))*: Defendants acted on grounds applicable to the entire class, making injunctive and declaratory relief

appropriate for the classes as a whole. Absent class-wide injunctive relief, Defendants' unlawful conduct will continue, causing irreparable harm to Plaintiffs and all class members.

## CLAIMS FOR RELIEF

### Count I

### Direct Copyright Infringement,
### 17 U.S.C. § 101 et seq.

*Brought on behalf of the Copyright Class members*

165.   Plaintiffs reallege and incorporate by reference the allegations contained in all preceding paragraphs as though fully set forth here.

166.   Plaintiffs Woulard, ATS, and the Burjek Plaintiffs bring this claim individually and on behalf of all other Copyright Class members, for unauthorized reproduction, based on Defendants' copying, storage, and use of entire works during pre-training, training, and fine-tuning.

167.   Plaintiffs Woulard, ATS, and the Burjek Plaintiffs are the sole owners, co-owners, or exercise the exclusive control over the valid and enforceable copyrights in the sound recordings identified in this complaint (the "Copyrighted Recordings"). These Copyrighted Recordings are original, creative, fixed in tangible form, and properly registered with the U.S. Copyright Office.

168.   Under 17 U.S.C. § 106, Plaintiffs and class members have the exclusive rights to reproduce, distribute, publicly perform, publicly display, and create derivative works based upon their Copyrighted Recordings.

169.   Without authorization, Defendants intentionally and systematically copied, ingested, and used these Copyrighted Recordings as part of their AI

model training, and commercially exploited derivative outputs derived therefrom.

170.   Defendants' infringement extends beyond initial reproduction to retention, internal redistribution, and repeated re-use of Plaintiffs' Copyrighted Recordings in centralized corpora for engineering/non-training workflows. These ongoing reproductions are independent infringements.

171.   Defendants' commercial deployment of models built from those unlawful copies predictably substitutes for licensed uses across recognized markets, causing cognizable market harm even apart from any specific output match.

172.   Independent of training, based on information and belief, Defendants acquired, standardized, indexed, and retains full-fidelity copies of Plaintiffs' recordings (and lyrics) from unauthorized online sources, organized into an internal central library used for reference, evaluation, model-comparison, and post-training features (including remastering and style calibration), uses not necessary for model training. This pirated-library copying is not fair use.

173.   Defendants' infringement extends further, producing and distributing derivative AI-generated music directly derived from Plaintiffs' Copyrighted Recordings. These unauthorized derivative works compete with Plaintiffs' original recordings, undermining their commercial value and disrupting crucial licensing opportunities—opportunities that are particularly essential for independent artists.

174.   Defendants' infringement is deliberate and intentional. Defendants openly admitted their intent to bypass licensing obligations, explicitly adopting a business strategy premised on intentional copyright infringement.

175.   As a direct and proximate result of Defendants' ongoing infringement, Plaintiffs, especially independent artists, suffer substantial and irreparable harm, including lost licensing revenues, diminished market opportunities, damage to their professional reputations, and loss of critical control over their creative works.

176.   Defendants' infringement has been and continues to be willful and intentional, demonstrating reckless disregard for Plaintiffs' exclusive rights. Defendants were aware, or should have been aware, that their copying, ingestion, and use of the Copyrighted Recordings violated established copyright laws.

177.   Unless enjoined by this Court, Defendants' infringement will continue unabated, causing irreparable harm to Plaintiffs' economic and creative interests. Monetary damages alone are insufficient to fully redress the harm caused by Defendants' ongoing infringement, necessitating injunctive relief to prevent continued violations.

178.   Plaintiffs seek relief, including statutory damages (or alternatively actual damages and profits attributable to the infringement), attorneys' fees and costs, and injunctive relief pursuant to 17 U.S.C. §§ 502, 504, and 505.

**Count II**

**Direct Copyright Infringement (Distribution of Copyrighted Recordings, 17 U.S.C. §106(3))**

*Brought on behalf of the Copyright Class members*

179.   Plaintiffs reallege and incorporate by reference the allegations in ¶¶1–164 as though fully set forth here.

180.   Plaintiffs Woulard, ATS, and the Burjek Plaintiffs and the Copyright Class own or exercise the exclusive control over the Copyrighted Recordings. Under 17 U.S.C. § 106(3), Plaintiffs have the exclusive right to distribute copies or phonorecords of their works to the public by sale or other transfer of ownership, or by rental, lease, or lending.

181.   In addition to, and independent of, Defendants' unauthorized reproduction of Plaintiffs' Copyrighted Recordings (Count I), Defendants distributed or caused to be distributed unauthorized copies of those works to third parties and the public, including by electronic transmission and remote provisioning that placed copies in the possession, custody, or control of non- Defendants entities. Defendants' infringement began with the unauthorized reproduction of Plaintiffs' and class members' Copyrighted Recordings during AI training and continues through retention, internal replication, and engineering re-use

182.   On information and belief, without authorization, Defendants transmitted, uploaded, provided, or otherwise made available copies of Plaintiffs' Copyrighted Recordings, and datasets and corpora containing them,

to third parties in at least the following ways (each an act of distribution under
§ 106(3)):

a. *Third-party platform integrations.* On information and belief, in
connection with Defendants' commercial integrations with third-party
products, Defendants transmitted, provisioned, or otherwise caused copies of
training and/or evaluation datasets containing Registered Copyrighted
Recordings to be accessible within those partners' environments and pipelines,
or to be received and held by their personnel, systems, or managed
infrastructure for integration, validation, and deployment purposes.

b. *External compute/storage vendors.* Defendants transmitted and
stored copies of Copyrighted Recordings with third-party cloud compute and
storage providers (including hyperscale vendors) for training, fine-tuning,
evaluation, staging, backup, and disaster-recovery workflows, thereby
delivering copies to entities outside Defendants for their operation and
maintenance in the ordinary course of those services.

c. *Contractors, vendors, and collaborators.* Defendants distributed
copies to outside contractors, data labeling/evaluation vendors, research
collaborators, and other Unknown Defendants who "compiled, scraped, [or]
obtained copyrighted sound recordings for inclusion in Defendants' AI training
data," including to facilitate preprocessing, curation, quality control, and
model-evaluation tasks.

d. *Multi-entity data pipelines.* Defendants seeded or replicated
Copyrighted Recordings into shared, multi-entity data pipelines (e.g., external

object stores, artifact registries, code/data repositories, or model-ops systems) accessible to non- Defendants personnel, enabling those third parties to download, cache, shard, batch, or otherwise hold copies.

e. *Off-site replication and disaster recovery.* Defendants caused additional distributions by replicating Copyrighted Recordings to off-site backup/disaster-recovery systems operated by third parties, including geo-replication that created and maintained additional copies in non-Defendants facilities.

183. Each electronic transmission, upload, replication, provisioning, or third-party access enablement identified above constitutes a distinct distribution of Plaintiffs' Copyrighted Recordings "to the public" under § 106(3), regardless of whether Defendants labeled such transfers as temporary, intermediate, encrypted, or for "testing," and regardless of subsequent deletion. For avoidance of doubt, "to the public" includes making copies available to multiple independent third parties—such as partners, vendors, contractors, or collaborators—whether by transmission, remote provisioning, or placement into multi-entity data stores, notwithstanding labels like "temporary," "encrypted," or "testing."

184. These distributions were commercial and willful, undertaken to accelerate product, scale Defendants' subscription platform, and secure competitive advantage and investment.

185.   Plaintiffs allege distribution on information and belief where the specific recipients, transfer mechanisms, and volumes are peculiarly within Defendants' possession and those of its partners.

186.   In the alternative, even if Defendants' dataset transfers were not 'to the public,' each transfer created at least one unauthorized reproduction (server-side copy, cache, shard, checkpoint), independently violating §106(1).

187.   Reproduction and distribution are pleaded independently. Defendants' § 106(3) distribution infringements are pleaded as separate and additional to Defendants' § 106(1) reproduction infringements; distribution is not subsumed by reproduction in this Complaint.

188.   Plaintiffs seek the same forms of relief as in Count I for each act of distribution, including statutory damages (or, in the alternative, actual damages and profits), attorneys' fees and costs, and injunctive relief.

## Count III

### Direct Copyright Infringement of Unregistered Recordings, 17 U.S.C. §101 et seq.

*Brought on behalf of the Previously-Unregistered Copyright Class Members*

189.   Plaintiffs reallege and incorporate by reference the allegations in ¶¶1–164 as though fully set forth here.

190.   Plaintiffs bring this claim individually and on behalf of the Previously Unregistered Copyright Class members, for unauthorized reproduction, based on Defendants' copying, storage, and use of entire works during pre-training, training, and fine-tuning.

191.   Plaintiffs and Subclass members own previously unregistered sound-recording copyrights ("Previously Unregistered Copyrighted Recordings") that Defendants copied, ingested, trained on, and exploited. These recordings are original, creative, fixed in tangible form, and protected under 17 U.S.C. § 102(a) upon creation and fixation.

192.   Plaintiffs and class members possess exclusive rights under 17 U.S.C. § 106 to reproduce, distribute, publicly perform, publicly display, and create derivative works from their Previously Unregistered Copyrighted Recordings.

193.   Without Plaintiffs' or class members' authorization, Defendants intentionally and systematically copied, ingested, reproduced, distributed, and commercially exploited these Previously Unregistered Copyrighted Recordings by incorporating them into Defendants' generative AI platform.

194.   Defendants' infringement began at the point of unauthorized copying of Plaintiffs' and class members' Previously Unregistered Copyrighted Recordings during AI training and continued with each subsequent AI-generated derivative work commercially exploited by Defendants.

195.   Independent of training, based on information and belief, Defendants acquired, standardized, indexed, and retains full-fidelity copies of Plaintiffs' recordings (and lyrics) from unauthorized online sources, organized into an internal central library used for reference, evaluation, model-comparison, and post-training features (including remastering and style

85

calibration), uses not necessary for model training. This pirated-library copying is not fair use.

196.   Defendants' unauthorized use has harmed, and continues to irreparably harm, Plaintiffs and the class by undermining licensing opportunities, diminishing the economic value of original recordings, and impairing their professional reputations.

197.   Plaintiffs and the class are entitled to injunctive and declaratory relief, disgorgement of Defendants' profits attributable to infringement, and actual damages incurred, pursuant to 17 U.S.C. §§ 502 and 504(b). For any work encompassed by this Count that was unregistered at the time of filing, Plaintiffs have filed or will promptly file registration applications and will supplement this pleading with certificate details when issued. Plaintiffs do not seek adjudication or entry of relief under the Copyright Act for any such work unless and until registration (or refusal) has issued; upon issuance, this Count shall be deemed supplemented to include the relevant registration(s).

198.   Plaintiffs expressly do not seek statutory damages or attorneys' fees under this count due to the unregistered status of these copyrights.

### Count IV

### Direct Copyright Infringement of Musical-Composition Lyrics, 17 U.S.C. §101 et seq.

*Brought on behalf of the Lyrics Copyright Subclass
and Previously-Unregistered-Lyrics Subclass*

199.   Plaintiffs reallege and incorporate by reference the allegations in ¶¶1–164 as though fully set forth here.

200.   Plaintiffs Woulard, ATS, and the Burjek Plaintiffs are the owners of valid and enforceable copyrights in the lyric compositions listed in Exhibit A (the "Copyrighted Lyrics"). Each is an original literary work fixed in a tangible medium and properly registered with the U.S. Copyright Office.

201.   Under 17 U.S.C. § 106, Plaintiffs and class members hold the exclusive rights to reproduce, distribute, publicly perform, publicly display, and create derivative works based on their Copyrighted Lyrics.

202.   Without permission, Defendants intentionally and systematically copied, ingested, and stored the Copyrighted Lyrics, either in whole or substantial part, as training data (and subsequent fine-tuning data) for its music-generation models.

203.   The first act of infringement occurred the moment Defendants reproduced Plaintiffs' Copyrighted Lyrics in its training datasets. Every subsequent round of model training, updating, or fine-tuning that relied on those copies constitutes a separate, independently actionable infringement.

204.   Defendants' models routinely generate new lyric outputs— sometimes verbatim, sometimes with minimal cosmetic changes, other times echoing distinctive phrasing, rhyme schemes, hooks, or narrative structures— that are derivative of Plaintiffs' Copyrighted Lyrics. These outputs are offered to paying users and compete directly with the original works in licensing, synchronization, streaming, and live-performance markets.

205.   As a direct and proximate result of Defendants' lyric-level infringement, Plaintiffs have suffered (and will continue to suffer) lost

mechanical and synchronization fees, diminished publishing revenues, dilution of the market value of their catalogs, and loss of artistic control over how and where their lyrics appear.

206.   Defendants' conduct is willful and in reckless disregard of Plaintiffs' rights. Defendants knew, or consciously avoided knowing, that copying entire lyric databases without a license violates the Copyright Act and standard music-publishing practices.

207.   Unless enjoined, Defendants will continue to copy, retain, and exploit Plaintiffs' Copyrighted Lyrics, causing irreparable harm that monetary damages alone cannot remedy.

208.   Plaintiffs who own unregistered lyric copyrights seek only actual damages, Defendants' profits attributable to the infringement, and injunctive relief under 17 U.S.C. § 504(b); they do not seek statutory damages or attorneys' fees for those unregistered works. For any lyrics encompassed by this paragraph that were unregistered at the time of filing, Plaintiffs have filed or will promptly file registration applications and will supplement this pleading with certificate details when issued. Plaintiffs do not seek adjudication or entry of relief under the Copyright Act for any such work unless and until registration (or refusal) has issued; upon issuance, this Count shall be supplemented to include the relevant registration(s).

**Count V**

**Direct Copyright Infringement of Musical-Composition Expression (Non-Lyric),
17 U.S.C. § 101 et seq.**

*Brought on behalf of the Musical-Composition (Non-Lyric) Registered
and Previously-Unregistered Subclasses.*

209.   Plaintiffs reallege and incorporate by reference the allegations in
¶¶1–164 as though fully set forth here.

210.   Plaintiffs (and/or their music-publishing affiliates or exclusive
licensees) own valid, enforceable copyrights in musical compositions
independent of lyrics, including protectable melodic, harmonic, and rhythmic
expression and fixed arrangements, identified in Exhibit A (the "Copyrighted
Musical Compositions (Non-Lyric)"). Each work listed in Exhibit A is an original
work of authorship fixed in a tangible medium; where noted, the work is
registered with the U.S. Copyright Office with an effective date of registration
before the infringements alleged herein.

211.   Under 17 U.S.C. § 106, Plaintiffs hold the exclusive rights to
reproduce and distribute the Copyrighted Musical Compositions (Non-Lyric),
and to prepare derivative works (including but not limited to musical
arrangements and orchestrations).

212.   Without authorization, Defendants intentionally and systematically
copied and reproduced the Copyrighted Musical Compositions (Non-Lyric) as
part of their training/fine-tuning pipeline. On information and belief,
Defendants: (i) ingested full-length sound recordings embodying Plaintiffs'
compositions; (ii) performed audio-to-symbolic and audio-to-feature

transformations to extract or infer melodic pitch-time sequences, chord progressions, harmonic rhythm/voice-leading, meter/tempo maps, groove patterns, arrangement/stem structure, and timbral/orchestration features; and (iii) fixed those representations in intermediate files, token sequences, spectrograms, embeddings, and model parameters retained for extended durations across training runs and model versions. Each such fixation constitutes an unauthorized reproduction under § 106(1).

213.   The foregoing reproductions include complete or substantially complete non-lyric musical expression from Plaintiffs' compositions (e.g., distinctive motifs, hooks, chord-progression-plus-groove combinations, arrangement choices, and orchestration patterns), captured through Defendants' batch processing, segmentation, and tokenization workflow alleged in the current complaint.

214.   Plaintiffs' claims in this Count do not depend on current proof of public-facing outputs. Liability arises from unauthorized reproduction during ingestion, training and storage of Plaintiffs' musical-composition expression.

215.   In the alternative, to the extent Defendants' service outputs reproduce or are substantially similar to distinctive melodic/rhythmic motifs, hooks, chord-progression-plus-groove combinations, signature arrangement/orchestration choices, or other non-lyric expressive elements from Plaintiffs' compositions, such outputs constitute unauthorized derivative works under § 106(2) that compete in synchronization, production/library, performance, and other licensing markets.

90

216. On information and belief, Defendants distributed or caused to be distributed copies or material portions/representations of Plaintiffs' non-lyric musical-composition expression (including datasets, feature matrices, token sequences, embeddings, and/or model checkpoints containing memorized composition content) to third-party vendors and infrastructure providers, and/or to collaborators and integration partners during development, testing, and deployment, each instance an additional violation of § 106(3).

217. Defendants' infringement was willful. Defendant publicly acknowledged launching and scaling without licensing the training data, accepting litigation risk rather than seeking permission, thereby demonstrating knowledge of and reckless disregard for Plaintiffs' exclusive rights.

218. As a direct and proximate result of Defendants' unauthorized reproductions (and, in the alternative, derivative outputs), Plaintiffs suffered and will continue to suffer harm, including loss of licensing revenues (e.g., composition dataset/training licenses, synchronization/production/library, performance, and arrangement-use fees), market dilution and substitution in music-for-media and production/library markets, and loss of control over the integrity and presentation of their musical works.

219. For composition works in Exhibit A that are registered prior to infringement and those registered by members of the class prior to infringement, Plaintiffs seek statutory damages and attorneys' fees under 17 U.S.C. § 504(c) and § 505.

220.    For composition works in Exhibit A that are unregistered and those that were unregistered by members of the class prior to infringement, Plaintiffs seek injunctive relief, actual damages, and disgorgement of Defendants' profits attributable to the infringement under § 504(b), and will seek to amend to add statutory damages and fees for any such works that become registered consistent with 17 U.S.C. § 412. For any musical composition encompassed by this paragraph that was unregistered at the time of filing, Plaintiffs have filed or will promptly file registration applications and will supplement this pleading with certificate details when issued. Plaintiffs do not seek adjudication or entry of relief under the Copyright Act for any such composition unless and until registration (or refusal) has issued; upon issuance, this Count shall be supplemented to include the relevant registration(s).

221.    Monetary relief alone cannot redress Defendants' ongoing reproduction of Plaintiffs' musical-composition expression in training corpora, intermediate representations, and model parameters. Plaintiffs therefore seek a permanent injunction prohibiting Defendants from further copying, storing, using, or distributing Plaintiffs' non-lyric composition content (including associated features/embeddings/parameters), and requiring deletion/purge of all copies and derivatives containing Plaintiffs' composition material from Defendants' systems, vendors, and collaborators.

222.    Plaintiffs incorporate by reference their DMCA § 1202 allegations regarding removal/alteration of CMI to the extent Defendants stripped

composer/publisher identifiers from composition sources used to build lyric-independent composition datasets or feature sets; and Plaintiffs' BIPA allegations to the extent Defendants' training captures and reproduces distinctive vocal style elements inseparable from composition arrangements.

### Count VI

### Removal or Alteration of Copyright Management Information, 17 U.S.C. §1202(b)

*Brought on behalf of DMCA Subclass, Lyrics Copyright Subclass, Previously-Unregistered-Lyrics Subclass, Musical-Composition (Non-Lyric) Registered and Previously Unregistered Subclasses*

223.   Plaintiffs reallege and incorporate by reference the allegations contained in ¶¶1-164 as though fully set forth here.

224.   Plaintiffs, including the DMCA Subclass, Lyrics Copyright Subclass, Previously-Unregistered-Lyrics Subclass, Musical-Composition (Non-Lyric) Registered and Previously-Unregistered Subclasses, bring this claim under 17 U.S.C. § 1202(b).

225.   Defendants intentionally removed and/or altered CMI embedded in both (i) sound-recording files and (ii) lyric-text files during the copying, conversion, and segmentation of those works for AI training. The stripped-or-modified CMI includes, by way of example, song titles, songwriter and performer names, publishers, ISRC and ISWC codes, embedded watermarks, and copyright notices, all of which identify rightful ownership and licensing terms.

226.   Plaintiffs' Copyrighted Recordings include embedded CMI, such as artist names, track titles, album details, producer and engineer credits,

copyright notices, licensing restrictions, and unique identifying information, in metadata formats such as ID3 tags, embedded watermarks, and other audio file headers.

227.  This embedded CMI plays a critical role in identifying Plaintiffs' works, safeguarding ownership, enabling proper licensing, and protecting their economic and creative rights in the music marketplace.

228.  On information and belief, Defendants intentionally and systematically removed, altered, or obscured Plaintiffs' CMI from sound recordings when Defendants copied, converted, standardized, segmented, and ingested these recordings into their AI training datasets. Such removal and alteration stripped Plaintiffs' recordings of essential identifying information, severing critical attribution to Plaintiffs.

229.  Defendants knew or had reason to know that removing or altering Plaintiffs' CMI would facilitate or conceal its unauthorized copying and infringement. Given the vast scale, sophisticated methods, and intentional nature of Defendants' conduct, Defendants' removal and alteration of CMI was deliberate, willful, and purposeful.

230.  Defendants further disseminates outputs from its generative AI that frequently contain identifiable audio signatures originally embedded as CMI, such as producer tags or distinct artist identifiers, but stripped of their original context or attribution. This intentional misappropriation causes confusion regarding the true source and ownership of the resulting AI-generated works and obscures the underlying infringement of Plaintiffs' rights.

231.   Each individual removal, alteration, or distribution of Plaintiffs' recordings stripped of CMI constitutes a separate violation of 17 U.S.C. § 1202(b). Given Defendants' ingestion and alteration of tens of millions of recordings, including substantial numbers of Plaintiffs' works, the scope and volume of violations are immense.

232.   Defendants are not entitled to any of the safe harbor protections under 17 U.S.C. §512. Unlike passive service providers, Defendants actively and intentionally copied, ingested, and manipulated Plaintiffs' sound recordings and associated CMI. Defendants' AI platform is not a passive conduit or hosting service. It's a sophisticated, active commercial system designed to copy, alter, and distribute copyrighted works without authorization or attribution. As such, Defendants cannot credibly claim the protection of the safe harbors provided by Section 512.

233.   Plaintiffs have suffered, and continue to suffer, substantial and irreparable harm from Defendants' deliberate removal and alteration of CMI. This harm includes significant loss of licensing opportunities, reduced market value of Plaintiffs' works, diminished control over their creative output, and harm to Plaintiffs' professional reputations and standing in the marketplace.

234.   Unless restrained by the Court, Defendants' unlawful conduct will continue, causing Plaintiffs ongoing irreparable harm for which monetary damages alone are inadequate. Immediate and permanent injunctive relief is therefore necessary to halt Defendants' ongoing violations.

235.   Plaintiffs seek relief under 17 U.S.C. §§ 1203 and 1202(b), including statutory damages for each separate act of CMI removal or alteration, attorneys' fees, litigation costs, and injunctive relief sufficient to fully address and halt Defendants' unlawful practices.

**Count VII**

**Circumvention of Access Controls, DMCA § 1201**

*Brought on behalf of the § 1201 Anti-Circumvention Subclass*

236.   Plaintiffs reallege and incorporate by reference the allegations contained in ¶¶1-164 as though fully set forth here.

237.   The Digital Millennium Copyright Act prohibits (i) circumvention of a technological measure that effectively controls access to a copyrighted work, 17 U.S.C. § 1201(a)(1); (ii) manufacturing, importing, providing, or otherwise trafficking in technology, products, services, devices, or components that are designed for, have limited commercially significant purpose other than, or are marketed for circumventing access controls, § 1201(a)(2); and (iii) trafficking in technology, products, services, devices, or components that are designed for, have limited commercially significant purpose other than, or are marketed for circumventing copy-control measures that protect rights under Title 17, § 1201(b)(1).

238.   On information and belief, during the Class Period Defendants and/or their data vendors and agents acquired vast volumes of commercially released recordings by bypassing or defeating stream-protection and download-prevention technologies widely deployed by rightsholders and

licensed platforms, including but not limited to cryptographic signature schemes and rolling ciphers used to prevent direct downloads (e.g., YouTube's rolling cipher), HTTPS tokening/HLS AES-128 session keying, and digital rights management systems such as Widevine, PlayReady, and FairPlay, which are technological measures that, in the ordinary course of their operation, require the application of information, processes, or treatments authorized by the copyright owner to gain access to the underlying audio files. For example, Defendants avoided, bypassed, removed, deactivated, and/or impaired YouTube's rolling cipher by running signature-decoding routines and other code to generate unauthorized requests to the protected media endpoints.

239. On information and belief, Defendants circumvented these technological measures, without the authority of copyright owners, by "avoid[ing], bypass[ing], remov[ing], deactivat[ing], or impair[ing]" them to obtain decrypted or otherwise unprotected copies for ingestion and training, including by deploying or procuring automated ripping/scraping utilities and decryption routines capable of resolving platform ciphers, session keys, or DRM to extract raw audio. 17 U.S.C. § 1201(a)(3)(A). For example, the authorized YouTube player computes an ephemeral, cipher-derived signature for each request to the media endpoints (including segmented streams). Without that computation, the content data is not returned. Defendants' stream-ripping code reproduced this computation outside the authorized player to obtain the protected data. Defendants' own pipeline then converted the resulting files to

raw, metadata-free formats for storage and batch, confirming the end-to-end purpose of obtaining unprotected access at scale.

240. On information and belief, Defendants manufactured, adapted, integrated, and/or procured technologies, products, services, devices, or components (including custom scripts, modules, and ingest services) that are primarily designed for circumvention of platform access controls and/or copy controls; that have no or only limited commercially significant purpose other than circumvention; and/or that were provided, supplied, or used by Defendants and their data vendors for circumvention, all in violation of §§ 1201(a)(2) and (b)(1). These tools/services enabled the reproduction of decrypted audio files, their conversion to raw formats, and subsequent storage and reuse in Defendants' training data lake.

241. On information and belief, Defendants also procured or coordinated with third-party "ripper" services or vendors (presently named as Unknown Defendants) that trafficked in circumvention technologies and provided Defendants with decrypted audio at scale, or with turnkey services to defeat access controls on licensed platforms and digital storefronts, thereby facilitating Defendants' mass reproduction of protected works.

242. As further alleged in Count VI, Defendants' ingestion pipeline removed or altered CMI and segmented files to anonymize origins, thereby concealing and facilitating the underlying anti-circumvention and downstream copying. The reproduction of audible watermarks/producer tags in Defendants'

outputs is consistent with copying from decrypted sources rather than clean stems, further corroborating circumvention at ingestion.

243. Defendants' conduct was knowing and willful. They chose to proceed without the constraints of licensing, and Defendants refuses to disclose their training data. No statutory exemption applies: Defendants' activities are not nonprofit library/archival uses, interoperability reverse-engineering, encryption research, or security testing; they are commercial, large-scale data acquisition for a for-profit generative-AI service.

244. These anti-circumvention violations are independent of any underlying infringement liability, and "fair use" is not a defense to § 1201 circumvention or trafficking claims.

245. Defendants' violations caused and continue to cause irreparable harm, including loss of control over access to Plaintiffs' works, facilitation of unlicensed reproductions used to train Defendants' models, impairment of licensing markets, and concealment of copying through removal of CMI, all at industrial scale.

246. Under 17 U.S.C. § 1203, Plaintiffs and the § 1201 Subclass seek: (a) permanent injunctive relief prohibiting further circumvention and trafficking; (b) impoundment and destruction of any circumvention technologies, devices, components, scripts, or services in Defendants' possession, custody, or control, and deletion of any decrypted copies obtained via circumvention; (c) statutory damages of not less than $200 and not more than $2,500 per act of circumvention, access, or trafficking in violation of

§ 1201, and/or actual damages and profits, as the Court deems just; (d) costs

and reasonable attorneys' fees; and (e) any other relief the Court deems proper.

## Count VIII

## False Copyright Management Information (DMCA § 1202(a))

*Brought on behalf of the DMCA Subclass, Copyright Class, the Unregistered*
*Copyright Class, the Lyrics Copyright Subclass, the*
*Previously-Unregistered-Lyrics Subclass, Musical-Composition (Non-Lyric)*
*Registered and Previously-Unregistered Subclasses*

247.   Plaintiffs reallege and incorporate by reference the allegations

contained in ¶¶1-164 as though fully set forth here.

248.   The Digital Millennium Copyright Act ("DMCA") prohibits any

person from knowingly and with the intent to induce, enable, facilitate, or

conceal infringement: "(1) provid[ing] copyright management information that is

false; or (2) distribut[ing] or import[ing] for distribution copyright management

information that is false." 17 U.S.C. § 1202(a).

249.   "Copyright management information" ("CMI") includes, inter alia:

(a) the title and other identifying information for a work, (b) the name of the

author, (c) the name of the copyright owner, (d) terms and conditions for use of

the work, and (e) identifying numbers or symbols referring to such information,

when conveyed in connection with copies or phonorecords of a work. 17 U.S.C.

§ 1202(c).

250.   On information and belief, Defendants provide and distribute false

CMI in multiple, independent ways, including but not limited to:

     a.   Defendants embed hidden digital watermarks or signatures within

the audio of each generated music track. These watermarks are not traditional

visible marks but rather subtle, algorithmically-placed patterns in instrumentation, dynamics, or spatial audio that serve as a unique acoustic fingerprint identifying Mureka as the source of the file. Such embedded markers are invisible to listeners yet detectable by Mureka's systems (or similar detection tools) even if the audio is altered. This technology is designed so that any copy or derivative of the output can be traced back to Mureka's model, thereby constituting CMI (information about the work's origin) attached to the music file. By automatically injecting these identifiers into the AI-generated track, Mureka is effectively providing CMI that identifies *itself* as the source/creator of the content. If the generated output in fact contains protectable expression from Plaintiffs' works, then the Mureka-specific watermark falsely designates authorship, rendering it false CMI under 17 U.S.C. § 1202.

b. Mureka's platform visibly labels AI-generated tracks with the prompting user's handle, misleadingly crediting that user as the creator/author of the musical work. For example, on Mureka's public "Library" or shared song pages, each track is displayed with an attribution line naming the user – e.g. a song might be listed as *"Ballad of the Bold" by Mudrat* (where "Mudrat" is the Mureka account username of the user). These attribution lines appear on output file pages and in shareable cards/artifacts, tagging the user as the author or owner of the track. In reality, if the output incorporates protected elements copied from Plaintiffs' songs, the credit "by [username]" is false and misleading – it implies that the user exclusively authored the music,

thereby obscuring the original rights of Plaintiffs. By affixing the user's name as the creator in connection with the AI-generated track, Mureka is providing or distributing false CMI (authorship information) "in connection with" copies of the Plaintiffs' works. In short, the platform's UI falsely identifies the prompting user as the author/owner of any content generated, even when that content may in fact derive from someone else's copyrighted material.

c. Mureka's policies and help materials assign default ownership claims to either Mureka or the user, in a manner that can be false when Plaintiffs' content is included in outputs. According to Mureka's terms (and summarized in its help center and community discussions), users on a paid subscription "are considered the owner of the song", whereas outputs created on the free tier are owned by Mureka by default. Specifically, Mureka's Terms of Service state that *free-tier users forfeit all rights in their outputs to Mureka* (the company retains "all rights, title and interest" in free-generated tracks), while paid tier users receive a broad license/ownership of their generated songs. Mureka actively encourages commercial exploitation of AI-generated music by paid users: for instance, it advertises that Pro/Paid plans come with full usage rights and commercial authorization for the content. It even provides an "Ownership Certificate" for paid outputs and a built-in marketplace for users to monetize their creations. These ownership designations are conveyed with the outputs (e.g. via the certificate or metadata indicating the user or Mureka as owner). However, when an output track in fact contains protected expression from Plaintiffs' recordings or lyrics, any such designation — *"Owned*

102

*by Mureka"* or *"Owned by [User]"* — is inaccurate and misleading CMI. In those cases, Mureka is effectively attaching false copyright ownership information to works that incorporate Plaintiffs' material. Labeling a track as owned by Mureka or the user (to the exclusion of the true rights holders) thus provides false CMI regarding the author/owner of the music.

      d.  Mureka's AI models have been observed to reproduce distinctive audio "producer tags" or vocal identifiers that originated in copyrighted songs, thereby embedding misleading authorship cues in the output audio itself. For example, certain outputs have included the iconic spoken tag "CashMoneyAP" – a producer audio stamp widely known to identify producer CashMoneyAP – even though CashMoneyAP had no involvement in the newly generated track. Mureka's system, having been trained on existing music (some containing such tags), can inadvertently echo these identifiers in its generated music. This means the output carries an audible indicator suggesting that a particular artist or producer created or endorsed the track when that is not the case. The presence of these tags in Mureka's outputs falsely attributes the new track to the tagged producer/artist, amounting to false CMI embedded within the sound recording itself. By distributing tracks with these misleading audio signatures, Defendants are effectively preserving and passing along original CMI (the producer's identity tag) in a falsified context – the tag incorrectly implies a creative source or author for the AI track, constituting false CMI under §1202. These incidents underscore that Mureka's training process strips away the original context of CMI (e.g., the tag's true connection to a different

song/creator) and then injects that CMI into new outputs where it does not belong, thus misidentifying the authorship of the new work.

e. Mureka conveys false or misleading information about the permissible use and ownership of outputs alongside the distribution of those outputs, which qualifies as false CMI regarding terms and conditions. For instance, Mureka markets its AI-generated tracks as "royalty-free" music that users can freely use or commercialize, and it labels output files (and related download pages) with indicators of who owns the track and what usage rights apply. As noted, free-tier outputs are labeled (per policy) as owned by Mureka, whereas paid-tier outputs are labeled as owned by the user with broad commercial rights. Mureka's documentation assures paid users that they have *"full usage rights and commercial authorization"* for their songs, implying the tracks carry no third-party restrictions. It also promotes the outputs as suitable for monetization and licensing (for example, through its integrated marketplace, where tracks can be sold as the user's own property). These "terms of use" designations travel with the output files – e.g., in the download page or file metadata it might be noted as *"© [User], licensed for any use"* or similar. When an output in fact includes substantial portions of a Plaintiff's copyrighted work, these Mureka-provided labels are false and conflicting CMI: they misrepresent the ownership and licensing status of the music. Labeling a track as *"owned by [User]"* and *"free for commercial use"* directly contradicts the Plaintiffs' rights in the incorporated expression. In effect, Mureka is distributing CMI that falsely states the terms and conditions for using the work

104

(suggesting no permission is needed beyond Mureka's license), whereas in truth the Plaintiffs' authorization would be required. This false assurance of broad rights attached to the output is a form of CMI about the usage rights that is knowingly false or misleading. Therefore, Mureka's practice of tagging outputs with unfettered usage rights (either belonging to itself or the user) constitutes providing false CMI regarding "terms and conditions for use" of the works, in violation of 17 U.S.C. §1202(c)(6).

251. As already alleged, Defendants' training pipeline removes and disassociates genuine CMI (e.g., ID3 tags, embedded credits, audible watermarks) from Plaintiffs' recordings and lyrics and then distributes outputs devoid of that CMI. Mureka simultaneously substitutes its own or its users' identifiers and ownership labels (webpage "by" lines, ownership statements for paid users, and Mureka's claimed ownership of Basic/free outputs), thereby providing "false CMI" in connection with those outputs.

252. Defendants knew the CMI they provided and distributed was false. Defendants: (i) publicly represent that paid users (or Mureka itself for free users) own outputs even though Defendants designed Mureka to ingest and reproduce protected elements of existing recordings and lyrics; (ii) removed authentic CMI during ingestion to frustrate traceability; and (iii) deployed the platform at commercial scale with knowledge that outputs would be labeled as authored/owned by someone other than the true rightsholders.

253. Defendants acted "with the intent to induce, enable, facilitate, or conceal infringement." 17 U.S.C. § 1202(a). Defendants' false "author/owner"

designations and commercialization messaging are designed to (and do) induce and enable wide distribution and monetization of outputs, to conceal that Plaintiffs' protected expression was copied during training, and to frustrate licensing and attribution markets by misdirecting content-ID systems and downstream licensees.

254.   Each instance in which Mureka: (a) displays a Mureka output page or share card with "by [username]"; (b) communicates that Mureka or the user is the owner of a track that incorporates Plaintiffs' protected expression; (c) reproduces third-party producer tags or similar identifiers suggesting false authorship; or (d) distributes such outputs through Mureka's site, APIs, Discord/Mobile apps, or partner and platform integrations, constitutes a separate violation of § 1202(a).

255.   Defendants' violations are willful. Defendants launched and scaled their platform anticipating that copyright disputes were an expected by-product; they intentionally removed authentic CMI and replaced it with their own/user CMI to grow usage and revenue, despite obvious risks to rightsholders.

256.   As a direct and proximate result, Plaintiffs and Class members suffered and will continue to suffer harm, including market confusion, lost or impaired licensing opportunities, dilution of attribution value, misdirection of content-ID and royalty systems, and the concealment of underlying infringements. Monetary relief alone is inadequate.

257.   Plaintiffs seek all remedies available under 17 U.S.C. § 1203, including: (a) statutory damages for each act of providing or distributing false CMI; (b) permanent injunctive relief enjoining Defendants from providing or distributing false CMI and requiring corrective measures (including reasonable technical means to attach accurate CMI, corrective notices on Mureka's output pages, and best-efforts notices to major distributors/partners to correct false CMI already disseminated); (c) disgorgement of profits attributable to false-CMI conduct; (d) costs and attorneys' fees; and (e) any further relief the Court deems just and proper.

## Count IX

### Contributory Copyright Infringement, Sound Recordings and Lyrics, 17 U.S.C. § 101 et seq.

*Brought on behalf of the Copyright Class, the Unregistered Copyright Class, the Lyrics Copyright Subclass, the Previously-Unregistered-Lyrics Subclass, Musical-Composition (Non-Lyric) Registered Subclass, and Musical-Composition (Non-Lyric) Unregistered Subclass*

258.   Plaintiffs reallege and incorporate by reference the allegations contained in ¶¶1-164 as though fully set forth here.

259.   Plaintiffs bring this claim individually and on behalf of the Copyright Class, the Previously Unregistered Copyright Class, the Lyrics Copyright Subclass, the Previously-Unregistered-Lyrics Subclass, Musical-Composition (Non-Lyric) Registered Subclass, and Musical-Composition (Non-Lyric) Previously-Unregistered Subclass.

260.   Third parties have directly infringed Plaintiffs' exclusive rights by reproducing, preparing derivative works from, distributing, publicly performing,

and/or displaying works that copy protected expression from Plaintiffs' sound recordings and lyrics without authorization:

a. End-users of Defendants' platform who, using Defendants' models and interfaces, generate, fix, and disseminate AI-created audio files and lyrics that are substantially similar to Plaintiffs' protected works, and then upload, stream, synchronize, or otherwise distribute those files on platforms such as YouTube, TikTok, Spotify, Instagram, and SoundCloud.

b. Data suppliers and compilers (Unknown Defendants) who reproduced and distributed Plaintiffs' recordings and lyrics to Defendants for ingestion into training and fine-tuning datasets without license or permission.

c. Technology and distribution partners who, at Defendants' direction or with Defendants' material assistance, reproduce and distribute infringing outputs through integrated channels, thereby making such outputs available to the public.

261. Defendants had actual knowledge that their platform and datasets were being used for infringement (and, at minimum, was willfully blind):

a. Defendants publicly acknowledged training on millions of tracks of existing copyrighted music without license, demonstrating knowledge that unlicensed copying had occurred.

b. Defendants refuse to identify the contents and provenance of their training data, despite recurring public reports of outputs echoing recognizable protected elements, facts that put Defendants on notice of ongoing infringements by users and data suppliers.

262.    Defendants also had constructive knowledge and were willfully blind because (i) their own pipeline intentionally strips and slices CMI from training inputs (making provenance detection harder), (ii) they are aware of overfitting and memorization risks, and (iii) they scaled commercial features that predictably yield infringing outputs.

263.    Defendants materially contribute to third-party infringement by providing the instruments and services that are the but-for technological cause of the infringements and by taking affirmative steps that facilitate and amplify them:

a.    *Supplying the means*: Defendants provides the models, servers, and interfaces that generate, fix, and deliver the infringing copies; absent Defendants' systems, the specific files at issue would not exist.

b.    *High-volume commercialization*: Defendants' tiers allow massive daily generation and grant commercial use, encouraging users to create and monetize outputs that substitute for Plaintiffs' works.

c.    *Enhancement tools that increase substitutability*: Features such as "Song Generation," "Instrumental Generation," "Lyrics Generation," "Song Extension," "Text-to-Speech," and related features make outputs more market-ready and more likely to mimic distinctive, protectable expression.

d.    *Integrated distribution*: Defendants' integrations reduce friction to public dissemination, materially assisting the reproduction and distribution of infringing outputs.

e. *CMI removal and provenance obfuscation*: Defendants' intentional removal/alteration of CMI and audio/text anonymization (ID3/title/artist/publisher/ISRC/ISWC removal; segmentation) foreseeably facilitates infringement by concealing ownership and frustrating rights-management.

f. *Failure to implement effective safeguards despite knowledge*: With awareness of overfitting and near-verbatim regeneration risks, Defendants failed to deploy or enforce effective guardrails to prevent outputs substantially similar to Plaintiffs' recordings or lyrics.

264. Independently and additionally, Defendants intentionally induce infringement. Defendants' public messaging and product design show an objective of promoting infringing uses: marketing radio-quality, releasing tools listed in the prior paragraph (subsection c), offering commercial-use tiers that scale with output volume, and integrating rapid distribution channels—while eschewing licensing constraints.

265. On information and belief, Defendants' end-users have generated outputs that copy protectable elements of Plaintiffs' works (including distinctive melodies, hooks, riffs, rhythmic figures, chord progressions arranged in a protectable selection/sequence, and lyric lines/phrases), and have uploaded and monetized those outputs on third-party platforms without authorization.

266. Defendants' conduct is a but-for and proximate cause of the third-party infringements. The infringements occurred through, and because of, Defendants' models, interfaces, product features, pricing, and integrations.

267. Defendants are not entitled to DMCA safe-harbor protections for the conduct alleged: Mureka is not merely a passive host storing material at a user's direction; it actively creates, manipulates, and disseminates the content and intentionally removes/obscures CMI (as separately alleged. This claim arises independently of, and in addition to, Defendants' direct and DMCA violations.

268. As a direct and proximate result of Defendants' contributory infringement and inducement, Plaintiffs and the Classes have suffered and will continue to suffer irreparable harm and damages, including (without limitation) lost licensing revenue and opportunities, market substitution and dilution, harm to catalog value, and loss of control over the presentation and integrity of their works.

269. Plaintiffs seek all remedies available under the Copyright Act, including but not limited to: (i) preliminary and permanent injunctive relief enjoining Defendants from materially contributing to or inducing infringement and requiring implementation of effective guardrails (including provenance logging, dataset segregation/deletion of unlicensed materials, CMI restoration, and output-filtering that blocks near-verbatim/regenerations of protected melodies, lyrics, and distinctive elements); (ii) statutory damages for registered works, or, in the alternative, actual damages and Defendants' profits; (iii) costs and attorneys' fees; and (iv) any further relief the Court deems just and proper. With respect to any United States works encompassed by this Count that were unregistered at the time of filing, Plaintiffs have filed or will promptly file

registration applications and will supplement this pleading with certificate details when issued. Plaintiffs do not seek adjudication or entry of relief under the Copyright Act as to any such work unless and until registration (or refusal) has issued; upon issuance, this Count shall be supplemented to include the relevant registration(s). Nothing in this paragraph limits claims as to works that are not "United States works" within the meaning of 17 U.S.C. § 411(a).

### Count X

### Vicarious Copyright Infringement, Sound Recordings and Lyrics, 17 U.S.C. § 101 et seq.

*Brought on behalf of the Copyright Class, the Unregistered Copyright Class, the Lyrics Copyright Subclass, and the Previously-Unregistered-Lyrics Subclass*

270. Plaintiffs reallege and incorporate by reference the allegations contained in ¶¶ 1-164 as though fully set forth here.

271. This Count is brought by Plaintiffs individually and on behalf of the Copyright Class, the Previously Unregistered Copyright Class, the Lyrics Copyright Subclass, and the Previously-Unregistered-Lyrics Subclass.

272. Plaintiffs and the Classes own or control the exclusive rights under 17 U.S.C. § 106 in the sound recordings and musical-composition lyrics identified in Exhibit A (and additional works to be identified in discovery), including the rights to reproduce, prepare derivative works from, distribute, and publicly perform their works.

273. In addition to directly infringing and contributing to infringement as alleged elsewhere, Defendants are vicariously liable for copyright infringement by third parties, including but not limited to: (i) Defendants' users

who, through the Mureka platform, generate, copy, distribute, publicly perform, and commercially exploit AI-generated audio that is derivative of, substantially similar to, or otherwise infringes Plaintiffs' works; and (ii) Defendants' contractors, vendors, data partners, and other Unknown Defendants who scraped, copied, supplied, processed, or prepared Plaintiffs' works for Defendants' training, fine-tuning, evaluation, filtering, or commercialization pipelines.

274. At all relevant times, Defendants' had, and exercised, the right and ability to supervise and control the infringing activity carried out through their service and by third parties acting for their benefit. Among other things, Defendants: (a) exclusively operate, configure, and maintain the servers, models, and interfaces that generate the infringing audio; (b) design, select, and update the training and fine-tuning corpora and model guardrails; (c) implement (or choose not to implement) prompt and output filters capable of preventing generation of infringing outputs; (d) set and enforce usage rules, credit limits, and content policies; (e) can identify, block, rate-limit, or suspend users and specific prompts/outputs; (f) curate, promote, and upgrade outputs that they determines will be available and in what form; and (g) control third-party integrations (e.g., via APIs, and platform channels) through which infringing outputs are generated and disseminated. Defendants' ability to prevent or limit the infringing activity, coupled with their failure to do so, satisfies the supervisory-control element.

275.   With respect to third-party data suppliers, contractors, or vendors (the Unknown Defendants), Defendants likewise possessed the contractual right to monitor, direct, accept, reject, or require re-processing of the data and code those entities acquired or prepared for Defendants' training pipelines, as well as the right to terminate or modify those relationships. Defendants' oversight and acceptance of training data and processing work, despite their infringing nature, further establishes Defendants' right and ability to supervise the underlying infringement.

276.   Defendants also received a direct financial benefit from the infringing activity. Defendants' revenues and enterprise value scale with the volume, virality, and commercial utility of outputs generated and shared by users, including outputs that are derivative of or substantially similar to Plaintiffs' works. By: (a) offering tiered, usage-based subscriptions that monetize each batch of outputs; (b) marketing Mureka as a frictionless alternative to licensed music creation and synchronization; (c) enabling commercial exploitation of AI-generated audio; and (d) expanding distribution through high-exposure integrations (e.g., with major platforms and consumer devices), Mureka attracts and retains paying users specifically because its system can generate music that substitutes for, or trades on, Plaintiffs' protected expression. The availability of infringing outputs thus draws users, increases engagement and upgrades, and fuels revenue and valuation, conferring a direct financial benefit that is causally tied to the infringing activity.

277. Defendants' internal product choices and growth marketing campaigns are designed to heighten output fidelity and recognizability, thereby increasing the substitutability of those outputs for licensed music and enhancing Mureka's commercial appeal. Defendants have operated without licensing constraints as a deliberate strategy to accelerate product quality and growth—underscoring that infringement-driven capabilities and usage were material drivers of Defendants' financial success.

278. By virtue of the foregoing, Defendants are vicariously liable for the infringing acts of its users and of third parties acting for its benefit. Defendants had the right and ability to supervise and control the infringement and received a direct financial benefit from it.

279. Defendants' conduct was and is willful and undertaken in reckless disregard of Plaintiffs' rights.

280. Plaintiffs and the Classes are entitled to all remedies available under the Copyright Act, including injunctive relief (17 U.S.C. § 502), statutory damages for registered works (17 U.S.C. § 504(c)), or, in the alternative, actual damages and Defendants' profits attributable to the infringement (17 U.S.C. § 504(b)), costs and attorneys' fees (17 U.S.C. § 505), and such other and further relief as the Court deems just and proper. With respect to any "United States works" encompassed by this Count that were unregistered at the time of filing, Plaintiffs have filed or will promptly file registration applications and will supplement this pleading with certificate details when issued. Plaintiffs do not seek adjudication or entry of relief under the Copyright Act as to any such

work unless and until registration (or refusal) has issued; upon issuance, this Count shall be deemed automatically supplemented to include the relevant registration(s). Nothing in this paragraph limits claims as to works that are not "United States works" within the meaning of 17 U.S.C. § 411(a).

**Count XI**

**Violation of Illinois Biometric Information Privacy Act,
740 ILCS 14/1 et seq.)**

*Brought on behalf of the Illinois Biometric Information Privacy Act Subclass*

281.   Plaintiffs reallege and incorporate by reference the allegations contained in ¶¶1-164 as though fully set forth here.

282.   Plaintiffs Woulard and the Burjek Plaintiffs bring this claim individually and on behalf of all other Illinois Biometric Information Privacy Act Subclass members.

283.   The Illinois Biometric Information Privacy Act ("BIPA"), 740 ILCS § 14/1 et seq., regulates the collection, use, storage, and dissemination of biometric identifiers, including "voiceprints," and prohibits private entities from collecting or using biometric data without explicit, informed written consent.

284.   The claims in this Count XI seek protection of Plaintiffs' unique biometric privacy rights under Illinois law, distinct and qualitatively different from rights granted under federal copyright law. BIPA safeguards personal biometric information independently from rights relating to the reproduction or distribution of creative works.

285.   Certain Plaintiffs are residents of Illinois, have recorded music or distinctive vocal tags clearly identifiable as their own voices, and therefore

116

possess protectable biometric identifiers as defined by BIPA. These voiceprints serve as unique biometric identifiers that can reliably distinguish Plaintiffs from other individuals.

286.   On information and belief, Defendants systematically collected, captured, copied, and stored Plaintiffs' distinctive biometric identifiers, including recognizable voiceprints or artist voice tags, when ingesting Plaintiffs' sound recordings into its generative AI training datasets. For each Illinois Plaintiff, Defendants computed and stored speaker-embedding vectors— fixed-length numerical templates derived from spectral features that uniquely identify the individual across recordings. These voiceprints permit re-identification and are biometric identifiers under 740 ILCS 14/10. Defendants captured, stored, and used these voiceprints without the written policies and informed consent BIPA requires.

287.   These embeddings are biometric identifiers under BIPA, not mere audio. Each scan/capture is a separate violation.

288.   For Illinois residents whose voices were captured, the capture and resulting injuries occurred primarily and substantially in Illinois.

289.   Defendants never obtained Plaintiffs' consent, let alone the informed written consent explicitly required by BIPA, to collect, capture, store, or otherwise use Plaintiffs' biometric identifiers. Plaintiffs were never informed about the specific purpose, duration, or terms regarding Defendants' use and storage of their voiceprints.

290.   Upon information and belief, Defendants retain Plaintiffs' biometric identifiers indefinitely within their AI training data and subsequent generative outputs. Defendants' continued use and storage of Plaintiffs' biometric data without consent directly violates 740 ILCS §§ 14/15(a) and 14/15(b).

291.   Defendants failed to develop, publicly disclose, and comply with a written retention schedule and guidelines for permanent destruction as required by 740 ILCS 14/15(a).

292.   Defendants further commercially exploits these biometric identifiers by generating AI music outputs that clearly reproduce Plaintiffs' distinctive voices, vocal signatures, or artist tags. These outputs, publicly accessible through Defendants' commercial platform, distribute Plaintiffs' biometric identifiers widely without Plaintiffs' consent, violating 740 ILCS 14/15(c) and (d).

293.   By systematically collecting, storing, using, and commercially disseminating Plaintiffs' biometric voiceprints without consent or notice, Defendants haver recklessly or intentionally violated multiple provisions of BIPA. Given Defendants' sophistication and public acknowledgments of the lack of licensing agreements or consents, its conduct was knowing and deliberate, or at a minimum, reckless.

294.   Defendants profited from the collection, capture, storage, and use of Plaintiffs' biometric identifiers (voiceprints) by embedding them in model parameters and internal corpora to create and sell AI music services, conduct prohibited by 740 ILCS 14/15(c), and disclosed biometric identifiers to

employees/contractors and partners through access to retained corpora and evaluation artifacts in violation of 740 ILCS 14/15(d).

295. Plaintiffs have suffered, and continue to suffer, substantial and irreversible harm as a result of Defendants' unlawful collection, storage, dissemination, and commercial exploitation of their biometric identifiers. This harm includes the loss of control over highly personal biometric data, increased risk of identity misuse, dilution of their personal and professional identities, diminished licensing opportunities, and ongoing threats to their privacy and autonomy as artists.

296. Under BIPA, Plaintiffs seek statutory damages of $5,000 for each intentional or reckless violation (or alternatively $1,000 per negligent violation), injunctive relief requiring Defendants to delete Plaintiffs' biometric data and cease any further use or dissemination, and reimbursement of attorneys' fees and litigation expenses, pursuant to 740 ILCS 14/20.

## Count XII

### Violation of Illinois Right of Publicity Act (IRPA), 765 ILCS 1075/1 et seq.

*Brought on behalf of the Illinois Right of Publicity Act Subclass*

297. Plaintiffs reallege and incorporate by reference the allegations contained in ¶¶1-164 as though fully set forth here.

298. Plaintiffs Woulard and the Burjek Plaintiffs (the "IRPA Plaintiffs") bring this Count individually and on behalf of the Illinois Right of Publicity Act Subclass (the "IRPA Subclass").

299. IRPA recognizes each individual's right "to control and to choose whether and how to use [their] identity for commercial purposes," and prohibits using an individual's identity for a commercial purpose during their lifetime without prior written consent. "Identity" includes, without limitation, a person's name, signature, photograph, image, likeness, and voice; "commercial purpose" includes use in advertising or promoting products or services, or on/within products or services.

300. Defendants used IRPA Plaintiffs' and IRPA Subclass members' identities, including their voices and distinctive vocal attributes, for commercial purposes without written consent. Defendants did so by:

a. Training and fine-tuning their models on recordings embodying plaintiffs' uniquely identifiable voices, thereby capturing and modeling their vocal identities; and

b. Generating and disseminating outputs that replicate or closely simulate plaintiffs' distinctive voices, vocal timbre, tags, or other identifiers, and using those outputs, and the ability to generate them, to market, promote, and sell Defendants' subscription service, and to drive paid tiers.

301. Defendants knew or should have known the voices and vocal signatures in Plaintiffs' recordings are core components of "identity" under IRPA and that exploiting those attributes for advertising, promotion, and monetization required prior written consent.

302. Defendants did not obtain IRPA Plaintiffs' or IRPA Subclass members' written consent to use their identities for any commercial purpose.

303.   Defendants' commercial uses included, inter alia, advertising and promoting Defendants' AI product and paid tiers; driving subscription sales by highlighting the service's capacity to generate human-sounding vocals; and encouraging public dissemination of outputs on platforms such as YouTube, TikTok, Instagram Reels, and Spotify, all to increase Defendants' revenue and market share.

304.   IRPA protects identity-based rights (name/voice/likeness), which are distinct from rights protected by the Copyright Act.

305.   Defendants' use of identities to promote and sell its service is classic commercial use not immunized by the First Amendment. *See Jordan v. Jewel Food Stores, Inc.*, 743 F.3d 509, 518–22 (7th Cir. 2014).

306.   Defendants' conduct is not news, public affairs, or a noncommercial account of public interest; it is the sale, advertising, and promotion of a for-profit AI music service.

307.   As to IRPA Plaintiffs and the IRPA Subclass, the challenged uses and injuries occurred primarily and substantially in Illinois: Defendants marketed and sold subscriptions in Illinois, ingested and exploited Illinois artists' voices, and disseminated voice-simulative outputs to and within Illinois.

308.   Defendants' violations were willful and reckless. Defendants publicly acknowledged launching and scaling without licensing constraints, while touting human-like vocals and rapid commercial growth—facts corroborating intentional commercial use of identity without consent.

309.   IRPA Plaintiffs and the IRPA Subclass suffered and continue to suffer injuries, including loss of control over their identities, dilution and commodification of their voices, reputational harm, and economic losses (including diversion of licensing value in their personas and diminished market for authentic performances).

310.   Defendants' violations are ongoing and continuing: each new training pass, model update, marketing use, and distribution of voice-simulative outputs within the limitations period constitutes a fresh IRPA violation; discovery has been impeded by Defendants' refusal to disclose training data and sources, warranting tolling and/or the discovery rule as appropriate.

## Count XIII

### Violation of Illinois Uniform Deceptive Trade Practices Act (UDTPA), 815 ILCS 510/1 et seq. (Injunctive Relief)

*Brought on behalf of the Illinois UDTPA Subclass*

311.   Plaintiffs reallege and incorporate by reference the allegations contained in ¶¶1-164 as though fully set forth here.

312.   Plaintiffs and class members are engaged in trade and commerce in Illinois and nationwide by creating, licensing, and selling music, sound recordings, and lyrics. Defendants conducts substantial business in Illinois and direct their marketing and services into this District. Defendants' challenged practices occurred "in the course of business" and affect commerce within Illinois.

313.   The UDTPA prohibits deceptive trade practices, including: passing off goods or services as those of another; causing likelihood of confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services; causing likelihood of confusion as to affiliation, connection, or association with another; representing that goods or services have characteristics, ingredients, uses, benefits, or quantities that they do not have; representing that goods or services are of a particular standard, quality, or grade if they are of another; and engaging in other conduct which similarly creates a likelihood of confusion or misunderstanding. 815 ILCS 510/2(a)(1)– (3), (5), (7), (12).

314.   In the course of its business, Defendants have engaged in deceptive trade practices within the meaning of 815 ILCS 510/2 by, among other things:

a.   *Passing off/sponsorship & approval*: designing, training, and promoting a system that generates recordings "indistinguishable from human-created music" and that reproduce distinctive artist identifiers (e.g., producer/artist tags), thereby creating a likelihood of confusion that AI outputs are authorized by, affiliated with, sponsored by, or approved or certified by the real artists and rights-holders whose identities and recordings Defendants leveraged.

b.   *"Original/royalty-free/commercial-ready" claims*: marketing and enabling commercial exploitation of Defendants' outputs as "original" or otherwise suitable for downstream commercial use while omitting or obscuring

material facts about (i) Defendants' ingestion of unlicensed works to build the system and (ii) the risk of confusion, affiliation, and rights encumbrances that follow. These representations misstate the characteristics and benefits of Defendants' goods/services and are likely to mislead users, licensees, platforms, and the public.

     c. *Affiliation/association*: deploying and integrating Defendants' system into mainstream consumer channels in a manner that reinforces the mistaken impression that outputs are endorsed by, affiliated with, or derived from licensed catalogs or living artists, when they are not.

     d. *Quality/standard misrepresentation*: representing outputs as "radio-quality" and indistinguishable from human while simultaneously relying on unlicensed ingestion and replication of distinctive artist expression and voice identifiers that foster market confusion regarding origin and authorship and blur the line between genuine artist recordings and Defendants' outputs.

315.  These practices are likely to cause confusion among consumers, licensees, platforms, distributors, and the public as to the source, sponsorship, approval, or affiliation of Defendants' outputs, and as to whether Defendants have obtained appropriate licenses or approvals from the artists and rights-holders whose identities and copyrighted recordings Defendants leveraged.

316.  Plaintiffs and class members are persons "likely to be damaged" by Defendants' deceptive trade practices within the meaning of 815 ILCS 510/3. Among other harms: confusion diverts demand, depresses licensing prices,

impairs brand/artist goodwill, and undermines the integrity and provenance of Plaintiffs' works and identities, including where Defendants' outputs echo distinctive producer or artist "audio tags."

317.   No actual damages need be proven for UDTPA injunctive relief, and proof of actual confusion is not required; a likelihood of confusion or likelihood of damage suffices under 815 ILCS 510/3.

318.   This claim is not preempted by the Copyright Act, 17 U.S.C. § 301, because it requires extra elements—deceptive conduct and likelihood of confusion as to source, sponsorship, approval, affiliation, and product characteristics—that are qualitatively different from the exclusive rights protected by copyright. Plaintiffs seek injunctive and ancillary equitable relief tailored to prevent marketplace deception, not to vindicate mere rights of reproduction or distribution.

319.   Defendants' deceptive trade practices were and are willful. Defendants publicly acknowledged a strategy of operating without constraints and knowingly courting litigation risk rather than obtaining licenses, while simultaneously promoting their service for mass commercial exploitation in ways likely to mislead consumers about authorization and provenance.

320.   Plaintiffs seek preliminary and permanent injunctive relief under 815 ILCS 510/3, including orders that Defendants shall:

a.   Cease making or implying claims in Illinois (marketing, UI/UX, FAQs, ToS, partner integrations) that Defendants' outputs are "original," "royalty-free," "fully cleared," "commercial-ready," or otherwise free of

third-party rights unless Defendants (i) possess, and (ii) clearly disclose the existence and scope of appropriate licenses.

b.   Implement clear, prominent disclosures (pre- and post-generation) stating that Defendants' outputs may not be authorized, sponsored, or approved by any referenced artist/label/publisher and may implicate third-party rights.

c.   Disable and/or effectively filter prompts and outputs within Illinois that are likely to cause confusion as to source, affiliation, sponsorship, or approval, including outputs that reproduce or emulate identifiable producer/artist "audio tags," distinctive voiceprints, or other source-identifying indicia (without written authorization from the identified person or rights-holder).

d.   Add durable machine-readable provenance/watermarking to all outputs distributed into Illinois that (i) identifies Mureka as the generative source and (ii) states that the output is not an authentic recording by any human artist unless expressly authorized.

e.   Provide corrective notices through Illinois-facing marketing channels and partner integrations clarifying that Defendants' outputs are not sourced from, endorsed by, or affiliated with specific artists or labels absent express disclosure.

f.   Institute and publish a UDTPA compliance program (policies, training, human-in-the-loop review, and auditing) designed to prevent future confusion about source, sponsorship, affiliation, and authorization.

g.  Pay Plaintiffs' costs and reasonable attorneys' fees pursuant to 815 ILCS 510/3 because Defendants have willfully engaged in deceptive trade practices knowing them to be deceptive.

## Count XIV

### Unjust Enrichment (Illinois Common Law)

*Brought on behalf of the Unjust Enrichment Subclass*

321.  Plaintiffs reallege and incorporate by reference the allegations contained in ¶¶1-164 as though fully set forth here.

322.  This Count is brought on behalf of the Illinois Unjust Enrichment Subclass (the "Unjust Enrichment Subclass") and, to the extent Illinois law is applied on a classwide basis, on behalf of all Plaintiffs and Class members whose injuries occurred in Illinois. Plaintiffs plead this Count in the alternative to their legal claims pursuant to Fed. R. Civ. P. 8(d)(2)–(3).

323.  Defendants retained and continues to retain concrete benefits derived from Plaintiffs' and the Unjust Enrichment Subclass's works, identities, and market goodwill, including but not limited to:

a.  avoided licensing fees and acquisition costs for audio and lyric datasets;

b.  accelerated time-to-market and model quality improvements that drove user growth, platform integrations, and platform stickiness; and

c.  subscription revenues from their paid tiers designed to scale output volume and commercial exploitation; and

324. These retained benefits were obtained at Plaintiffs' and the Unjust Enrichment Subclass's expense: Defendants' model quality and market expansion were built on unconsented copying/ingestion of recordings and lyrics and on the removal/obfuscation of CMI (authors, performers, publishers, ISRC/ISWC, producer tags), which eliminated licensing opportunities, impaired attribution, and diluted catalog value.

325. Defendants' enrichment is "unjust" because it is predicated on wrongful conduct beyond simple reproduction rights, including:

a. DMCA § 1202(b) CMI removal/alteration in Defendants' "strip-and-slice" pipeline (conversion to raw formats, metadata stripping, segmentation), intentionally concealing sources and depriving rightsholders of attribution and licensing signals.

b. BIPA violations through collection, storage, and commercialization of Illinois artists' voiceprints and distinctive vocal identifiers without the informed written consent BIPA requires), a privacy-based extra element independent of any § 106 right.

c. IRPA violations through use of distinctive voices/identities for commercial purposes without consent, rights not preempted by the Copyright Act.

326. Independently and in the alternative, Defendants' retention of benefits is unjust because Defendants systematically leveraged Plaintiffs' and the Unjust Enrichment Subclass's creative outputs to flood the market with

AI-generated tracks, displacing demand and licensing revenue that would otherwise accrue to rightsholders.

327. Defendants' benefits are directly linked to the challenged misconduct: the more copyrighted/lyric content and biometric/identity data Defendants ingested (while stripping CMI), the more "radio-quality" outputs it produced, which Defendants monetized via subscriptions, enterprise integrations, and fundraising predicated on product capability and growth.

328. Equity will not permit Defendants to retain the above benefits, acquired and maintained through the concealment of origin (CMI removal), exploitation of Illinois artists' voiceprints without consent (BIPA), and appropriation of identity (IRPA), without paying restitution to those whose works and identities supplied the value.

329. This Count is pled in the alternative and is expressly tethered to non-copyright wrongs (e.g., § 1202 CMI removal, BIPA, and IRPA). To the extent any aspect overlaps with rights equivalent to 17 U.S.C. § 106, Plaintiffs seek restitution only where an extra element renders the claim qualitatively different and not preempted.

330. To the extent legal remedies under the Copyright Act, DMCA, or BIPA are inadequate to disgorge Defendants' full unjust gains (including valuation windfalls and enterprise synergies), equity requires restitution and ancillary relief.

331. Plaintiffs and the Unjust Enrichment Subclass seek:

a.  Restitution of the value unjustly obtained, measured by (without limitation): (i) avoided licensing/acquisition costs for training sets; (ii) a fair share of subscription and enterprise revenues attributable to AI capabilities trained on Plaintiffs' works; (iii) unjust gains reflected in fundraising and post-money valuation increases causally tied to the challenged conduct; and (iv) the value of data assets/models derived from unlawfully obtained inputs.

b.  Disgorgement of profits and an equitable accounting to trace, quantify, and return all benefits derived from the unlawful conduct, including ancillary partnership/integration consideration (e.g., product integrations that monetized model capabilities).

c.  Imposition of a constructive trust over revenues and assets (including models, weights, datasets, and derivative products) unjustly enriched by Plaintiffs' works and identities, pending accounting and restitution.

d.  Injunctive relief preventing further retention or use of unjust gains and requiring corrective measures (including restoration/maintenance of CMI where feasible), without prejudice to broader injunctive relief sought elsewhere in the Complaint.

e.  Pre- and post-judgment interest and such other equitable relief as the Court deems just.

## PRAYER FOR RELIEF

332. Plaintiffs, individually and on behalf of all others similarly situated, respectfully request that this Court enter judgment against Defendants and award the following relief:

a. *Class certification*: Find that this action satisfies the requirements for maintenance as a class action as set forth in Rule 23 of the Federal Rules of Civil Procedure, certifying the Classes and Subclasses defined herein, appointing Plaintiffs as representatives of the Classes, and appointing Plaintiffs' counsel as Class Counsel;

b. *Judgment*: Enter judgment in favor of Plaintiffs and all Class Members and against Defendants on all counts;

c. *Injunctive Relief (Copyright Act)*: Grant a permanent injunction pursuant to 17 U.S.C. § 502 prohibiting Defendants, their affiliates, subsidiaries, employees, agents, and all persons acting in concert or participation with it, from further copying, ingesting, reproducing, distributing, publicly performing, creating derivative works from, or otherwise commercially exploiting Plaintiffs' and class members' copyrighted sound recordings without authorization;

d. *Injunctive Relief (DMCA)*: Grant a permanent injunction pursuant to 17 U.S.C. §1203 requiring Defendants, their affiliates, subsidiaries, employees, agents, and all persons acting in concert or participation with them, to cease all intentional removal, alteration, or obscuring of Copyright

Management Information (CMI), and where feasible, to restore or properly

attribute all previously removed or altered CMI;

e. *Injunctive Relief (Illinois BIPA)*: Grant a permanent injunction

pursuant to 740 ILCS § 14/20 of the Illinois Biometric Information Privacy Act

requiring Defendants to immediately delete all biometric identifiers and

biometric information collected from Illinois subclass members, prohibiting any

further collection, storage, use, or dissemination of such biometric data

without informed written consent, and mandating full compliance with all

applicable BIPA provisions moving forward;

f. *Statutory Damages—Sound Recordings (Registered)*: For each

sound recording owned by Plaintiffs and/or the Copyright Class that is eligible

for statutory damages pursuant to 17 U.S.C. §§ 412 and 504(c), award

statutory damages, at Plaintiffs' election under § 504(c), in amounts to be

determined by the jury, including up to $150,000 per infringed work for willful

infringement under § 504(c)(2), and otherwise as permitted by § 504(c)(1).

g. *Statutory Damages (Lyrics)*: Award Plaintiffs and the Lyrics

Copyright Subclass statutory damages pursuant to 17 U.S.C. § 504(c) for each

infringed musical-composition (lyric) registration — up to $150,000 per work

for willful infringement (or up to $30,000 per work absent willfulness) —

together with any enhanced damages, pre- and post-judgment interest, and

such other relief the Court deems just and proper;

h. *Statutory Damages—Musical Compositions (Non-Lyric; Registered)*:

For each registered musical-composition (non-lyric) work owned by Plaintiffs

and/or the applicable Musical-Composition (Non-Lyric) Subclasses that is eligible for statutory damages pursuant to 17 U.S.C. §§ 412 and 504(c), award statutory damages, at Plaintiffs' election under § 504(c), in amounts to be determined by the jury, including up to $150,000 per infringed work for willful infringement under § 504(c)(2), and otherwise as permitted by § 504(c)(1).

    i.   *Statutory Damages (DMCA/CMI)*: Award Plaintiffs and other class members statutory damages pursuant to 17 U.S.C. § 1203(c)(3)(B) for each violation involving removal or alteration of CMI, in the maximum amount allowed by law;

    j.   Where statutory damages are available, Plaintiffs reserve the right, as permitted by law, to elect statutory damages or actual damages and profits on a work-by-work basis at any time before final judgment, subject to 17 U.S.C. § 412.

    k.   *DMCA § 1201 Injunction/Impoundment*: Permanent injunctive relief under 17 U.S.C. §1203 enjoining Defendants from circumventing or trafficking in any technology, product, service, device, component, or part thereof that circumvents technological measures controlling access to, or protecting rights in, Plaintiffs' and the Classes' works; impoundment and destruction of any such circumvention technologies and deletion of decrypted copies obtained via circumvention.

    l.   *Impoundment/Destruction (17 U.S.C. § 503)*: Order impoundment and destruction of (i) all infringing copies of Plaintiffs' works in Defendants' possession, custody, or control, including in datasets, caches, or intermediary

133

files; and (ii) any model parameters/weights and embeddings shown to be derived from Plaintiffs' works to the extent necessary to remedy ongoing infringement and prevent further harm.

m. *DMCA § 1201 Statutory Damages*: Statutory damages pursuant to 17 U.S.C. § 1203(c)(3)(A) of not less than $200 and not more than $2,500 per act of circumvention, access, or trafficking in violation of § 1201, or, at Plaintiffs' election, actual damages and Defendants' profits.

n. *Statutory Damages—DMCA § 1202 (CMI)*: At Plaintiffs' election before final judgment, award statutory damages for each violation of 17 U.S.C. § 1202 in the sum of not less than $2,500 and not more than $25,000, together with any additional relief provided by § 1203.

o. *Statutory Damages (Illinois BIPA)*: Award Plaintiffs and other class members statutory damages under the Illinois Biometric Information Privacy Act, 740 ILCS § 14/20, including $5,000 for each intentional or reckless violation, or alternatively $1,000 per negligent violation, in the maximum amount permitted by law, plus reasonable attorneys' fees, costs (including expert fees), and other relief including injunctive relief as appropriate;

p. *Actual Damages and Disgorgement (Previously Unregistered Copyrights)*: Award Plaintiffs and other class members with previously unregistered copyrights, including owners of unregistered musical-composition (lyrics) copyrights, actual damages, including disgorgement of all profits attributable to Defendants' unauthorized exploitation of their works, as permitted under applicable federal law;

q. *Declaratory Relief (Copyright Infringement)*: Enter a declaratory judgment pursuant to 28 U.S.C. § 2201 declaring that Defendants' unauthorized copying, ingestion, training, and commercial exploitation of Plaintiffs' and class members' sound recordings constitute copyright infringement under the Copyright Act;

r. *Declaratory Relief (DMCA/CMI)*: Enter a declaratory judgment pursuant to 28 U.S.C. § 2201 declaring that Defendants' intentional removal, alteration, or obscuring of Plaintiffs' and class members' CMI violates 17 U.S.C. § 1202(b) (removal/alteration of CMI) and § 1202(a) (false CMI);

s. *Declaratory Relief (Illinois BIPA)*: Enter a declaratory judgment pursuant to 28 U.S.C. § 2201 declaring that Defendants' collection, use, storage, and dissemination of Illinois subclass members' biometric identifiers and biometric information violates the Illinois Biometric Information Privacy Act, 740 ILCS § 14/1 et seq.;

t. *IRPA Injunctive Relief*: Enter a permanent injunction under 765 ILCS 1075/40 enjoining Defendants from using Plaintiffs' and IRPA Subclass members' identities, including their names, voices, signatures, photographs, images, likenesses, and any simulated or synthesized versions thereof, for any commercial purpose without prior written consent; and requiring deletion of models, datasets, and embeddings encoding such identities.

u. *IRPA Damages and Profits*: Award actual damages, Defendants' profits attributable to the unauthorized uses, punitive damages, costs, and reasonable attorneys' fees as allowed by 765 ILCS 1075/40–/55.

135

v. *Injunctive Relief (UDTPA)*: Grant preliminary and permanent injunctive relief under 815 ILCS 510/3 as pleaded in the UDTPA count, including corrective advertising/disclosures, prompt/output filters to prevent source confusion, provenance labeling, Illinois-facing integration changes, a UDTPA compliance program, and an award of costs and reasonable attorneys' fees for willful violations.

w. *Unjust Enrichment (Illinois)*: Award restitution and disgorgement of benefits unjustly retained, and impose a constructive trust as necessary to prevent unjust enrichment under Illinois law.

x. *Impoundment and Destruction, 17 U.S.C. § 503; DMCA § 1203(b)*: Order the impoundment of all infringing copies and any devices or products involved in violations, and upon final judgment, the destruction or other reasonable disposition of (i) all copies/phonorecords and all articles by which such copies or phonorecords may be reproduced, and (ii) any device or product involved in DMCA violations; including datasets, caches, shards, training checkpoints and, to the extent necessary to abate ongoing infringement, model parameters/weights and embeddings derived from Plaintiffs' works, or remedial modification sufficient to prevent further use of infringing material.

y. *Accounting and Disgorgement*: Order an accounting of Defendants' revenues and profits attributable to the infringements and DMCA violations, and disgorgement of such profits.

z. *Attorneys' Fees and Costs*: Award Plaintiffs their reasonable attorneys' fees and costs under 17 U.S.C. § 505 (copyright), 17 U.S.C. §

136

1203(b)(4)–(5) (DMCA), 740 ILCS 14/20(3) (BIPA), and 765 ILCS 1075/55 (IRPA), and as otherwise permitted by law.

       aa.   *Pre- and Post-Judgment Interest*: Award pre- and post-judgment interest to the maximum extent permitted by law;

       bb.   *Additional Relief*: Grant any other further legal or equitable relief the Court deems just, equitable, and proper, including, where appropriate, constructive trust, accounting, or other equitable remedies.

### JURY TRIAL REQUESTED

Plaintiffs, individually and on behalf of all other Class members, request a trial by jury on all claims so triable.

Dated: December 17, 2025       LOEVY & LOEVY

       /s/ Ross Kimbarovsky

       _____

       Ross Kimbarovsky (6229590)
       ross@loevy.com
       Jon Loevy (6218524)
       jon@loevy.com
       Michael Kanovitz (6275233)
       mike@loevy.com
       Matthew Topic (6290923)
       matt@loevy.com
       Aaron Tucek    (98624)
       aaron@loevy.com
       LOEVY & LOEVY
       311 North Aberdeen, 3rd Floor
       Chicago, IL 60607
       312.243.5900 (phone)
       312.243.5902 (fax)

       *Attorneys for Plaintiffs Attack the Sound LLC, David Woulard, Stan Burjek, James Burjek, Berk Ergoz, Hamza Jilani, Maatkara Wilson, Arjun Singh, Magnus Fiennes, and Michael Mell.*